**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DUVAL ENGINEERING & CONTRACTING COMPANY, Respondent.**

**No. 19265.**

United States Court of Appeals
Fifth Circuit.

Nov. 14, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., Washington, D. C., for petitioner.

O. R. T. Bowden, Jacksonville, Fla., for respondent.

Before TUTTLE, Chief Judge, BELL, Circuit Judge, and CARSWELL, District Judge.

CARSWELL, District Judge.

The Board seeks enforcement of its order issued August 10, 1961 on complaint alleging violations by respondent of Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.). The acts complained of occurred in and around Jacksonville and Mayport Naval Air Station, Florida.

Both the Examiner and the Board found that respondent had violated the provisions of both Sections 8(a) (1) and 8(a) (3) of the Act. The Board ultimately ordered respondent to cease and desist these violations and to reinstate, with back wages, 32 employees.[1]

Respondent is a Florida corporation engaged in marine dredging and road construction and engineering work connected

1. 132 NLRB No. 65.

with these activities. The violations charged concern the respondent's marine division which consists of a marine repair yard, two dredges, the Duval and the Congaree, and assorted tugs and barges. During 1959 there were 65 employees in this division of whom approximately 40 were involved in the operations of the Congaree.

■ With the teachings before us of Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950), and National Labor Relations Board v. Florida Citrus Canners Cooperative, 288 F.2d 630 (5th Cir., 1961), reversed N. L. R. B. v. Walton Manufacturing Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962), and our appropriate standard of review there made explicit, we have examined the record and find substantial evidence to support the Board on all points involving 8(a) (1) and 8(a) (3) violations except in one particular. We conclude there is no substantial evidence in the record to support the majority view of the Board that the first 8(a) (3) violation occurred September 10, 1959. Rather, the record shows that this violation occurred October 14, 1959.

The 8(a) (1) violations by respondent were fully demonstrated on the record which supports the Board's finding that respondent interfered with, restrained, and coerced its employees by interrogating them concerning union activities, by requesting them to act as informers with respect to such activities, and by threatening them with discharge for joining or supporting the union.

For example, on the day after the first union organization meeting, Chief Balasus, officer in charge of the Congaree, asked Etna Beck, a deck hand employed since 1952, if he had attended the union meeting. Beck admitted that he had. Balasus urged Beck to divulge the names of others who attended, but Beck refused. Balasus proceeded to call individually at least nine other employees to his office aboard the Congaree, and to interrogate them about the union organization meeting, who was present, what they knew about the union, if they had signed union cards, etc. Many of these employees were urged to report to Balasus information about the union and to give him the names of all employees interested in it. There is evidence to show that during this period Balasus said, referring to those interested in the Union, "I'll get them one at a time even if it takes me five years." There is evidence that Balasus said on or about September 9, 1959, "A good many of them that was for the union * * * was going to get laid off."

Dilly Lewis, foreman and supervisor for respondent, also engaged in similar interrogations. There is evidence that during one of these Lewis told McGee, in effect, that the respondent was paying a thousand dollars for information concerning employees who were for the union and "was going to fire them all;" that respondent knew who attended the union meetings and was "going to get the right ones and run them off, fire everyone that was having anything to do with the union." And to David Wingate he said, "You guys don't know what you are getting into, as soon as the dredge gets to the yard everyone of you is going to be fired."

The facts surrounding the 8(a) (3) violations are summarized. In May, 1959, Harders Construction Company, general contractor for the construction of certain United States Navy destroyer ships at Mayport Naval Air Station, subcontracted with respondent for dredging. Respondent's dredge Congaree began work at Mayport on August 13. On September 8, respondent was ordered to cease dredging because further dredging would interfere with other operations going on at the naval base under another construction program. As a result, the dredge was compelled to return to respondent's marine yard. On arrival there on September 10 thirteen employees were laid off. About October 14 respondent hired *new* employees to replace those previously laid off, instead of following its customary practice of recalling *laid off* employees.

Eight of the thirteen laid off employees had applied for recall just prior to October 14, and were informed at that time that no work was available. The other five did not apply for re-employment and there is no charge of discrimination with respect to them.

About October 18 the Congaree returned to Mayport and dredged until ordered to stop about December 3. This stoppage was due to a steel shortage which prevented completion of certain bulkheads. Without completed bulkheads the dredging by respondent was causing cave-ins. The Congaree's crew during the second increment of dredging at Mayport consisted of eleven or twelve new employees. As noted above, none of the thirteen previously laid off crew members were recalled.

After operations at Mayport had been terminated the Congaree proceeded on December 14, 1959 to Sandfly Point where it dredged for rock on property owned by two of respondent's stockholders. Around December 30, J. D. Piver, an employee of some five or six years "off and on," was discharged by Balasus aboard the Congaree. Piver had been temporarily performing the duties of mate in place of the regular mate, Larrimore, who had been injured. When Larrimore recovered, he was returned to his old position as mate. A new employee, Toby Brown, was hired as oiler, and Piver was discharged. Piver had requested either the oiler position, filled by Brown, or a position then unfilled on the dump gang. Balasus responded to Piver's request, "Well, I don't know * * * well, it's just too much union."

On February 4, 1960, pursuant to a petition for certification filed by the union, the Board directed an election for the employees of respondent's marine division. The election was held on February 26, 1960. The union won the election 40 to 14. The Congaree returned to Jacksonville the next day. All but a few members of the crew of the Congaree were laid off on February 29, 1960. These few were retained to perform maintenance work. After the completion of this work the remaining crew members were laid off.

The Board concluded that the respondent was guilty of three 8(a) (3) violations and we agree that the record fully supports this determination except in one particular, i. e., the effective date of the first violation. The majority of the board fixed the effective date of this violation on September 10, 1959 when the Congaree returned to the marine yard to stop work, while the minority, finding no evidence to support this, found the effective date of the violation to be October 14, 1959, on which day eight employees were not re-hired when the work began again.

After a full review of the entire record we are convinced that it has not been established by substantial evidence that there was any departure from past practices in the method of selecting employees for the first layoff on September 10, 1959. The essential point here is: this layoff was necessitated by an order of the Navy and was compelled by economic factors, and this is not disputed anywhere in the record.

The clear showing of union animus is without question relevant, as well as knowledge of union adherence. In the absence of a credible explanation of the fact of layoff, this is enough to establish unlawful discrimination. But the conclusion of the work on September 10 was clearly due to the thoroughly credible fact of economic necessity. There is simply no evidence at all that any individual employee was laid off on September 10 due to union activity. Neither union activity nor respondent's animus toward it brought this condition about. The work was stopped at that time because there was no work to be done. All were laid off at that time due to the undisputed fact of economic necessity. There is no support for the Board's order fixing September 10 as the effective date of violation.

While it may well be surmised that ultimate retribution by respondent was smoldering for expression at the first opportunity, it could not and did not find

its outlet until the work was resumed and the crew made up on October 14. On that day 8 of the employees in question were not recalled and respondent's established procedure for employment of replacements was not followed. There and then, with work to be done and actually begun, there was clear discrimination by respondent against the subject 8 employees in violation of 8(a)(3).

Upon the record here the order of the Board will be enforced in all particulars with modification only to the extent that back pay be awarded the subject 8 employees from October 14, 1959, rather than September 10, 1959.

Enforced with modification.