**TRW–UNITED GREENFIELD DIVISION,**
**Petitioner-Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD,**
**Respondent-Cross-Petitioner.**

No. 79–3456.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1981.

Rehearing Denied March 24, 1981.

412

Constangy, Brooks & Smith, James F. Smith, Charles A. Edwards, Lovic A. Brooks, III, Atlanta, Ga., for petitioner-cross-respondent.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Robert G. Sewell, Susan L. Dolin, N.L.R.B., Washington, D. C., for respondent-cross-petitioner.

Curtis L. Mack, Director, Region 10, N.L.R.B., Atlanta, Ga., for other interested party.

Stanford, Fagan & Giolito, Morgan C. Stanford, James D. Fagan, Jr., Atlanta, Ga., for intervenor International Union et al. (UAW).

Before HENDERSON, POLITZ, and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

TRW-United Greenfield Division ("the Company") petitions for review, and the National Labor Relations Board cross-petitions for enforcement, of an order of the Board, 245 N.L.R.B. No. 147, adopting the

findings and conclusions of the Administrative Law Judge that TRW-United violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1976), during unionization efforts among TRW-United's employees at its Evans, Georgia plant. The Board found that the Company committed unfair labor practices by coercively interrogating certain employees concerning their own and other employees' union activities, soliciting an employee to report on the union activities of other employees, and threatening employees with loss of jobs, loss of promotions, plant closure, and a regressive bargaining posture if they unionized. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW ("the Union") has intervened to seek denial of the Company's petition and enforcement of the Board's order.

The question presented for review is whether the Board's finding that the Company violated § 8(a)(1) of the Act through coercive interrogation, solicitation, and the making of certain threats is supported by substantial evidence on the record considered as a whole.

## I.

## The Facts

The Company is an Ohio corporation engaged in diversified manufacturing, with plants located throughout the country. This case involves its plant at Evans, Georgia, which is engaged in the manufacture of high speed cutting tools. The Evans plant commenced operations in 1974, and at times material herein employed in excess of 600 employees.

In January, 1977, the Union began organizational activities among the Company's employees by conducting a meeting and obtaining signatures on a number of authorization cards. After a temporary suspension of overt activity, the Union resumed its organization drive in May of 1977, and, on October 18, 1977, petitioned the Board for a representation election. The election was held on December 16, 1977, and the employees voted 354 to 198 against union representation.

During the three months prior to the election, both the Company and the Union bombarded the employees with campaign propaganda. The Company engaged in a number of instances of conduct which the Administrative Law Judge and the Board found constituted unfair labor practices and which are the subject of the petition and cross-petition before this Court.

In describing these activities chronologically, we are eliminating some instances of interrogation which the Board found coercive but which may not meet the substantial evidence test. There are two instances, however, which clearly meet the test in our view, and we shall describe them and other events related to them in our chronological report.

Around the first of October, Supervisor Archie Burke approached employee Milton Andrews at Andrews' work station and asked him what he thought about the Union and what his reasons were for supporting it. Andrews replied by alluding to job security, access to management regarding employee problems, and better fringe benefits.[1]

On October 7, the Company sent a letter to all of its employees which stated in part:

As all of you know, our plant in Plymouth, Michigan was closed and shut down permanently for economic reasons. The UAW Union was in that plant and took money from the paychecks of the employees in dues, fees and other charges.

\* \* \* \* \* \*

The Union is attempting to get authorization cards signed which could commit you to obligations and liabilities that could interfere with your job, your pay, and your home life and your future. We, therefore, ask you *not to sign* a Union

---

1. Pursuant to instructions from Employee Relations Manager Jim Bailey, each Company supervisor maintained throughout the fall campaign a weekly roster of the employees under his supervision which indicated each employee's position in the campaign for that week. A plus indicated support for the Company, and a minus indicated support for the Union.

card or anything else until and unless you know exactly what your obligations and liabilities will be if you do.

Around the first part of November, employee Milton Andrews was in the office of Safety and Training Director Sam Wyse in the personnel section on a personal matter. With no one else present, Wyse asked Andrews what the employees in the plant thought about him (Wyse). Andrews replied that he "could not tell" Wyse. Wyse then asked Andrews what Andrews thought about the Union. Andrews again responded that there was "nothing [he] could tell" Wyse. Finally, Wyse asked Andrews if he would sit in on union meetings and report back to him what "was going on." Andrews replied that he could not do anything like that.

At some time before Thanksgiving, Director Wyse instructed employee Willie Sutton, a known Union organizer, to clock in and tell his foreman that he would be in Wyse's office for a while. When Sutton came to Wyse's office, Wyse told him that he wanted to talk about the Union. Wyse then asked, "What do you know about the Union, what's happening, ... [T]ell me something." Sutton replied, "[I]t's not for me to tell you what's going on." When Wyse assured Sutton that any reply would be confidential and personal, Sutton asked what he wanted to know. Wyse again asked, "What's happening?" Sutton replied that all he knew was that the employees wanted a union, and that they felt they were not being treated properly. He also alluded to a need for more pay and better sick leave. Wyse responded by saying that the Company was losing money and could not pay more at that time, but that "things are going to get better." Wyse then commented that "there's quite a few people been to the union meetings," to which Sutton replied, "I do not count heads."

On about December 1, Supervisor Louis Eldridge approached employee Andrews at his job when no one else was present and asked him if he had signed a union card. When Andrews replied that he was considering such an act, Eldridge told him that

the Union could be of "no significant value" to the employees.

During the two weeks immediately preceding the December 16 election, Operations Manager Roland Springstroh, who was chief operations officer of the Evans plant as well as of two other Company plants, conducted a series of approximately twenty meetings with the employees in which he attempted to dissuade then from unionization. At these meetings, Springstroh made comments from a prepared text and then entertained questions from the employees. At each of these meetings some employee would ask what would be the starting point of contract negotiations in the event of unionization. At this point Springstroh would hold up a blank sheet of paper, which always would be conveniently available, and tell the employees:

> [W]e start with a blank sheet of paper, ... we have the union over here and us over here and we start from that ... we'd start from [a blank sheet of paper] ... it would be like we'd be starting from scratch just like this blank sheet of paper.

When an employee asked Springstroh if "you're going to take my benefits away from me" if the Union came in, Springstroh replied, "No, I did not say that;" "[w]hen we sit down at the bargaining table we start from scratch, nothing." At another meeting, Springstroh said, "I'm not saying you will lose any benefits, I'm just saying when we, me and the negotiators, sit down at the negotiating table, we will start off with a blank sheet of paper." Springstroh also told the employees at these meetings that bargaining could go on for months or indefinitely, and gave no assurance that the Company would bargain in good faith.

During the week of the election, Employee Relations Manager Jim Bailey engaged employee Willie Sutton in a lengthy conversation about the Union. In the course of that discussion, Bailey spoke at length about the closings of two other Company plants, one in Detroit, Michigan, which had been represented by the Union, and one in Chicago, which had been unrepresented.

Bailey told Sutton that the Detroit plant had been closed for economic reasons in that "they couldn't afford it, they (the Union) was driving 'em out of the business through higher wages, you know, it was outrageous, they was asking for outrageous things." Referring to the Evans, Georgia plant, Bailey then stated, "[W]ell, if they sold us out and didn't want to pay those wages, they could just close down and write it off as a tax loss."

On December 14, Supervisor Tony Leitner engaged in an informal discussion about the Union with a group of employees. When one employee asked Leitner what would happen to their present benefits if the Union came in, Leitner replied, "[W]e would start with a blank sheet of paper." After a comment from the employee, Leitner continued by saying that "they would sit down at the table with a blank piece of paper and would negotiate a contract. These are the benefits you get, maybe the union would want to give up some of these and here are some more of these or whatever."

Finally, about two days before the election, Director Wyse approached employee Sutton at Sutton's machine and told him that he would like to have him on the Company's side. Wyse then said, "[Y]ou can go places with the Company, you've got the ability to go places, you know, we are in the process of making things better and you've got the ability to go places."

After losing the December 16 election, the Union filed unfair labor practice charges and elections objections.[2] Agreeing with the Administrative Law Judge, with a few minor exceptions not relevant here, the Board found that the Company violated § 8(a)(1) of the Act by (1) engaging in coercive interrogation in the above described encounters between Company personnel and employees Andrews, Sutton, and others; (2) soliciting employee Andrews to attend Union meetings and report the activi-

ties of the Union to management; (3) threatening employee Sutton with plant closure if the employees unionized and also with loss of promotion for supporting the Union; (4) threatening the employees as a whole with plant closure and loss of jobs in its October 7 letter; and (5) threatening, at the Springstroh and the Leitner meetings, to take a regressive bargaining stance which would jeopardize existing benefits if the employees unionized.

The Board's order directs the Company to cease and desist from coercively interrogating employees; threatening loss of existing benefits, closing of the plant, loss of jobs, loss of promotion, or other reprisals; and soliciting employees to report on the union activities of other employees. The order also includes the usual proscription in general terms forbidding the Company from interfering with, restraining, or coercing its employees in any like or related manner in the exercise of their rights guaranteed by § 7 of the Act, 29 U.S.C. § 157 (1976). Affirmatively, the Board's order directs the Company to post appropriate notices.

## II.

### The Unfair Labor Practices

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), prohibits employers from interfering with, restraining, or coercing employees in the exercise of their right of, *inter alia*, self-organization under § 7 of the Act, 29 U.S.C. § 157 (1976). The test for determining whether an employer has violated § 8(a)(1) is whether the employer's questions, threats, or statements tend to be coercive, not whether the employees are in fact coerced. *Sturgis Newport Bus. Forms, Inc. v. N. L. R. B.*, 563 F.2d 1252, 1256 (5th Cir. 1977); *N. L. R. B. v. Huntsville Manufacturing Co.*, 514 F.2d 723, 724 (5th Cir. 1975). The presence of coercive tendencies in a particular instance of an employer's conduct is to be determined in light of the totality

---

**2.** The Union's election objections were consolidated with the unfair labor practice charges for purpose of hearing and determination. The Board's election objection rulings did not result

in a final order and thus are not before this Court. *See Hendrix Manufacturing Co., Inc. v. N. L. R. B.*, 321 F.2d 100, 106 (5th Cir. 1963).

of the circumstances in which that particular instance of conduct occurred. *N. L. R. B. v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *N. L. R. B. v. Varo, Inc.*, 425 F.2d 293, 298 (5th Cir. 1970). "Remarks that may not appear coercive when considered in isolation may take on a different meaning when evaluated with respect to the totality of the circumstances." *N. L. R. B. v. Laredo Coca Cola Bottling Co.*, 613 F.2d at 1341 (quoting *N. L. R. B. v. Kaiser Agricultural Chemicals, Div. of Kaiser A. & C. Corp.*, 473 F.2d 374, 381 (5th Cir. 1973)).

■ We review the validity of the Board's order under the substantial evidence rule. 29 U.S.C. § 160(e) & (f) (1976); *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Mueller Brass Co. v. N. L. R. B.*, 544 F.2d 815 (5th Cir. 1977). We separately analyze the Board's findings of coercive interrogation, solicitation, threats of plant closure, job loss and promotion loss, and threats of the assumption of a regressive bargaining posture.

### A. Coercive Interrogation

■ Employer interrogation into union activities is not *per se* illegal. *N. L. R. B. v. Laredo Coca Cola Bottling Co.*, 613 F.2d at 1342; *Ridgewood Management Co. v. N. L. R. B.*, 410 F.2d 738, 740 (5th Cir. 1969), *cert. denied*, 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969). However, any interrogation of employees by an employer "presents an ever present danger of coercing employees in violation of their § 7 rights." *N. L. R. B. v. Laredo Coca Cola Bottling Co.*, 613 F.2d at 1342; *Texas Industries, Inc. v. N. L. R. B.*, 336 F.2d 128, 133 (5th Cir. 1964). In determining whether certain interrogation tends to be coercive in the totality of the circumstances, the following factors are to be considered: (1) the history of the employer's attitude toward its employees; (2) the nature of the information sought; (3) the rank of the official of the employer in the employer's hierarchy; (4) the place and manner of the conversation; (5) the truth-

fulness of the employees' reply; (6) whether the employer has a valid purpose in obtaining information concerning the union; (7) whether this valid purpose, if existent, is communicated to the employees; and (8) whether the employer assures the employees that no reprisals will be taken if they support the union. *Sturgis Newport Bus. Forms, Inc. v. N. L. R. B.*, 563 F.2d at 1256; *Florida Steel Corp. v. N. L. R. B.*, 529 F.2d 1225, 1229 (5th Cir. 1976); *N. L. R. B. v. Camco, Inc.*, 340 F.2d 803, 804 (5th Cir. 1965), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). This list is not exhaustive, however, and coercion may occur even if all of these factors operate in favor of the employer. *Sturgis Newport Bus. Forms, Inc. v. N. L. R. B.*, 563 F.2d at 1256; *N. L. R. B. v. Camco, Inc.*, 340 F.2d at 804.

In this case, the Board found that the Company engaged in eight instances of coercive interrogation of its employees. Applying the substantial evidence standard, it is questionable whether the Board's finding of coercive interrogation as to all of them is supported by substantial evidence on the record considered as a whole.

■ It is unnecessary, however, to search for substantial evidence in all the instances, since substantial evidence on the record as a whole supports the Board's finding of coercive interrogation in the encounters between Wyse and Andrews around the first part of November, and between Wyse and Sutton at some time before Thanksgiving. These instances are related in the facts, *supra*.

■ The conversation between Safety and Training Director Wyse and employee Andrews in the former's office around the first part of November constituted coercive interrogation on the Company's part, applying the above criteria for determining whether certain interrogation tends to be coercive. First, although there is no history of unfair labor practices at the Company's Evans, Georgia plant, the Company engaged in a systematic effort to ascertain the union sympathies of its employees

throughout the campaign. This effort was accomplished by having each Company supervisor talk to and observe the employees under his supervision and maintain, pursuant to instructions from Employee Relations Manager Jim Bailey, a weekly roster of his particular employees that indicated which employees supported the Company and which supported the Union for that week. Additionally, by this time the Company had implicitly indicated its opposition to the Union in the October 7 letter which it sent to all of its employees. Repeated efforts by an employer to determine who supports the union, coupled with employer opposition to the union, may be considered as background when determining whether a conversation tends to be coercive. *Sturgis Newport Bus. Forms, Inc. v. N. L. R. B.*, 563 F.2d at 1257.

Second, the information sought by Wyse was of a coercive nature. Wyse asked Andrews what the employees thought of him and also what Andrews thought of the Union. Although this information sought by Wyse was more innocuous than would have been information concerning the identities of the union leaders, it was more potentially harmful to the employees in terms of possible Company retaliation than would have been casual information regarding how the Union was doing. *See N. L. R. B. v. Camco, Inc.*, 340 F.2d at 807.

Third, as a Director, Wyse held a relatively high rank in the Company. Fourth, the conversation took place in Wyse's office, a place of authority or "unnatural formality," *N. L. R. B. v. Camco, Inc.*, 340 F.2d at 804, rather than at Andrews' work station or at some "neutral" location. Additionally, Wyse conducted his interrogation at a time when Andrews was seeking assistance from Wyse on a personal matter and was therefore potentially more susceptible to responding to such questioning.

Fifth, Andrews gave evasive answers to Wyse's questions, indicating he feared possible retaliation against himself or other employees by Wyse or other Company officials if he were to give honest and direct answers. "If an employee refuses to give a truthful answer even to an innocuous question, the inference of coercion is as strong as if he refused to answer a pointed question." *Id.* at 807.

Sixth, there is no indication in the evidence that Wyse or the Company had a valid purpose for inquiring into the employees' feelings about Wyse or Andrews' attitude toward the Union. Seventh, even if such a purpose existed, Wyse did not communicate it to Andrews. Finally, Wyse gave Andrews no assurance that there would be no reprisals against either Andrews or the other employees. "Questioning is much more likely to have a coercive effect if the purpose of the interrogation is not explained and if there are no assurances against retaliation." *N. L. R. B. v. Camco, Inc.*, 340 F.2d at 807 (citing *Martin Sprocket & Gear Co. v. N. L. R. B.*, 329 F.2d 417 (5th Cir. 1964)).

The conversation between Wyse and employee Sutton at some time before Thanksgiving similarly sustained a finding of coercive interrogation. Again, the encounter occurred in the context of the Company's opposition to the Union and its systematic effort throughout the campaign to ascertain the union sympathies of its employees. The questions, although general on their face, sought specific responses, including possibly the identities of the employees who had attended Union meetings. The questioner, Director Wyse, was again a high ranking Company official; and the questioning took place in the authoritative setting of the official's office, a fact attributable to the official's explicit request that the employee come to his office.

Moreover, Sutton refused to answer Wyse's probing questions about the Union's activities until receiving assurances of confidentiality; and, although he then began to discuss the Union with Wyse, he still gave an evasive response to Wyse's leading comment regarding employee attendance at the Union meetings. Thus, even Wyse's implicit assurance that no reprisals would be taken did not dispel Sutton's apparent concern over discussing the Union too extensively with a Company official. Finally,

there is no indication that either Wyse or the Company had a valid purpose for questioning Sutton, or that, if such a purpose existed, it was communicated to Sutton.

 .That Sutton publically exhibited his support of and leadership in the Union does not alter the suggestion of coercion. Although an employee has openly declared his support for the union, the employer is not thereby free to probe directly or indirectly into his reason for supporting the union. *ITT Automotive Electrical Products Division*, 231 N.L.R.B. 878 (1977). "[S]uch probing tends to have a coercive effect upon employees, whether or not the employees have openly declared their support for a union." *Id.; see also Paceco, A Division of Freuhauf Corp.*, 273 N.L.R.B. 399, 400 (1978), *vacated on other grounds*, 601 F.2d 180 (5th Cir. 1979). Sutton was knowledgeable and may well not have been coerced in this confrontation, which maintained a facade of friendliness. However, if an interrogation is coercive in nature it makes no difference that actual coercion was not achieved in the particular .instance. *See Sturgis Newport Bus. Forms, Inc. v. N. L. R. B.*, 563 F.2d at 1256.

The Company relies on *Federal-Mogul Corp. v. N. L. R. B.*, 566 F.2d 1245 (5th Cir. 1978), and *Delco-Remy Division v. N. L. R. B.*, 596 F.2d 1295 (5th Cir. 1979), in support of its contention that the Board's finding of instances of coercive interrogation was erroneous. These cases are inapposite, however. In *Federal-Mogul*, the Court found that there was no systematic campaign of monitoring union sentiments; that the employer's officials and the employees were longstanding friends; that the questions were asked by low-echelon supervisors; that the employees were interrogated informally and casually at their work stations or during their break periods; and that the employees' replies were truthful and without fear. 566 F.2d at 1250–51. Similarly, in *Delco-Remy*, the questioning was not systematic; most of the interrogators were low-level supervisors; the conversations took place at the employees' work stations; and the employees questioned gave candid and bold answers. 596 F.2d at 1310.

Accordingly, we find that there is sufficient evidence to uphold a Board finding of at least two instances of coercive interrogation.

### B. Solicitation to Report on Union Activities

 During their conversation in Wyse's office around the first part of November, Director Wyse solicited employee Andrews to attend Union meetings and report to management the activities of the Union. Although unsuccessful, this request constituted an impermissible interference with the employees in the exercise of their Section 7 rights. *See, e. g., N. L. R. B. v. Citizens Hotel Co.*, 313 F.2d 708, 709 (5th Cir. 1963) (instructing employee to engage in surveillance of union meeting); *N. L. R. B. v. Duval Engineering & Contracting Co.*, 311 F.2d 291, 292 (5th Cir. 1962) (requesting employees to act as informers with respect to union activities); *Independent, Inc. v. N. L. R. B.*, 406 F.2d 203, 205 (5th Cir. 1969) (manager's request of two employees that they "let him know if they heard any union talk").

Therefore, we hold that the Board properly based its order in part on a finding of solicitation of an employee to report on union activities.

### C. Threats of Plant Closure, Job Loss, and Loss of Promotion

 It is well settled that employer threats of plant closure, job loss, and loss of promotion in the event of unionization or support for a union are violative of § 8(a)(1) of the Act. *See, e. g., N. L. R. B. v. Pope Maintenance Corp.*, 573 F.2d 898, 905 (5th Cir. 1978); *N. L. R. B. v. Kaiser Agricultural Chemicals, Div. of Kaiser A. & C. Corp.*, 473 F.2d 374, 380–81 (5th Cir. 1973). Section 8(a)(1) is violated if, under the totality of the circumstances, "the employees could reasonably conclude that the employer is threatening economic reprisals if they support the Union." *Hendrix Manufacturing Co. v. N. L. R. B.*, 321 F.2d 100, 105 (5th Cir. 1963); *see also N. L. R. B. v. Kaiser Agricultural Chemicals*, 473 F.2d at 381.

An employer may express to his employees his general view about unionism or any of his specific views about a particular union, as long as such expression does not contain a "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c) (1976); *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547, 580 (1969). An employer may even make a prediction as to the economic consequences he believes unionization will have on his business. *Gissel Packing,* 395 U.S. at 618, 89 S.Ct. at 1942, 23 L.Ed.2d at 580.

> In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control.... (citation omitted). If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion....

*Id.* at 618, 89 S.Ct. at 1942, 23 L.Ed.2d at 580–81. An employer's conveyance of his belief, however sincere, that the plant would or might close as a result of unionization is not a statement of fact unless the possibility of closing is capable of proof, a situation which is highly unlikely. *Id.* at 618–19, 89 S.Ct. at 1942, 23 L.Ed.2d at 581.

Substantial evidence supports the Board's findings that the Company violated § 8(a)(1) by twice threatening plant closure and loss of jobs in the event of unionization. The first instance was in the letter of October 7 to all employees. The second was in the conversation between Director Wyse and employee Sutton about two days before the election. In this conversation, Sutton also was threatened with loss of promotion for supporting the Union.

The Company's October 7 letter, sent to all of its employees, stated that the Company's Plymouth, Michigan plant, where the Union "took money from the paychecks of the employees," had been closed permanently "for economic reasons." It then admonished the employees "not to sign" a Union card until they knew exactly what their obligations and liabilities to the Union would be. The reference in the letter to the closing of the Company plant in Plymouth, Michigan, where collective bargaining was established, could be found reasonably to imply that the Company might take similar action at the Evans plant as a retaliatory measure in the event of unionization there. This result holds despite the letter's statement that the closing of the Plymouth plant had been "for economic reasons."

Contrary to the Company's contentions, the reference to the closing of the Plymouth plant did not serve merely to indicate the effect of high union dues and obligations on union employees, or to illustrate that the Union does not always help its members. While high employee *wages* may bear on the economic condition of a business, high union *dues,* which the letter addressed, have no direct relevance at all.

Further, the letter does not constitute a permissible prediction, under *Gissel Packing,* of the economic consequences of unionization at the Evans plant, since it makes no reference to possible economic consequences at the Evans plant, and since any such reference would not have been susceptible to the requisite proof. The coercive nature of the Company's reference to the Plymouth plant is particularly validated by the testimony of Employee Relations Manager Bailey that the Union at the Plymouth plant had offered to negotiate lower wages to keep that plant open, and that labor costs were not a significant factor underlying the Plymouth plant's poor economic condition. The implication in the letter to the employees does not accord with these facts established at the Board's hearing.

The Company similarly threatened plant closure and job loss in the conversation between Employee Relations Manager Bailey and employee Sutton during the week of the election. During that conversation, Bailey stated that the Company's plant in Detroit had been closed because the Union

420

had demanded excessive wages and other benefits. Bailey then said that if similar demands were made at the Evans plant by a union, the Company could simply close down the Evans plant and write it off as a tax loss. Bailey's comments constituted an explicit threat that the Company might close down the Evans plant in the event of excessive wage demands resulting from unionization. Further, this threat was strengthened by Bailey's linking unionization with excessive wage demands in his reference to the Detroit plant. There is some evidence that labor costs were not the decisive factor in the closing of the Detroit plant, but there is no indication that this fact was ever communicated to Sutton.

The Company also threatened employee Sutton with loss of promotion if he supported the Union. During the conversation between Director Wyse and employee Sutton two days before the election, Wyse told Sutton that he (Wyse) would like to have Sutton on the Company's side in the campaign. Wyse then told Sutton that Sutton "had the ability to go places" with the Company. The close association of these two statements, combined with the coercive interrogation Sutton had undergone in Wyse's office a few weeks earlier, could very likely lead Sutton reasonably to conclude that his ability to "go places" with the Company in terms of promotions was contingent upon his siding with the Company in the campaign and election. In realistic industrial terms, a possible future opportunity for promotion to supervisor was dangled before Sutton if he would side with the Company.

The Board's findings that the Company threatened its employees with plant closure, job loss, and loss of promotion in the event of unionization are supported by substantial evidence. We uphold them.

### D. Threats of a Regressive Bargaining Posture

■ The Board found coercive and in violation of § 8(a)(1) the statements made by Operations Manager Springstroh throughout his 20 meetings with the em-

ployees, and by Supervisor Leitner during his informal discussion with a few employees two days before the election. These statements were that bargaining would begin "from scratch" or with a "blank sheet of paper" if the Union were to win the election. In our view, these findings are supported by substantial evidence.

■ " 'Bargaining from scratch' is a dangerous phrase which carries with it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election." *Coach & Equipment Sales Corp.*, 228 N.L.R.B. 440 (1977). Whether such a statement is coercive depends upon the context in which it is uttered. If the "clearly articulated thrust of the bargaining-from-scratch statement is that the mere designation of a union will not automatically secure increases in wages and benefits, and that all such items are subject to bargaining," *id.* at 441, no coercion will be found. If, however, the statement

can reasonably be read in context as a threat by the employer either to unilaterally discontinue existing benefits prior to negotiations, or to adopt a regressive bargaining posture designed to force a reduction of existing benefits for the purpose of penalizing the employees for choosing collective representation,

*id.*, a violation will be found. "[Bargaining-from-scratch] statements are objectionable when, in context, they effectively threaten employees with a loss of existing benefits and leave them with the impression that what they may ultimately receive depends in large measure upon what the union can induce the Employer to restore." *Plastronics, Inc.*, 233 N.L.R.B. 155, 156 (1977). When a close question exists, "[t]he presence of contemporaneous threats or unfair labor practices is often a critical factor in determining whether there is a threatening color to the employer's remarks." *Coach & Equipment Sales Corp.*, 228 N.L.R.B. at 441.

Springstroh's statements did not explicitly threaten that the Company would discontinue existing benefits prior to negotiations. They did, however, implicitly threaten that

the Company would adopt a regressive bargaining posture designed to force a reduction of existing benefits as a penalty for a Union victory in the election. Springstroh's remarks likely left the employees with the impression that the benefits they ultimately would receive in the event of unionization would depend largely upon what the Union could induce the Company to restore. This conclusion is especially true in light of the high rank of Springstroh in the Company and against the background of the other unfair labor practices committed by the Company prior to and contemporaneously with these meetings. Even occasional assurances that all benefits would be negotiable and could either go up, down, or remain the same do not alter this result, considering Springstroh's high rank, his constant emphasis of bargaining "from a blank sheet of paper," his statements that bargaining could go on for months, the Company's other unfair labor practices, and Springstroh's continuous graphic use of a blank sheet of paper to illustrate his point. *See Plastronics, Inc.*, 233 N.L.R.B. 155 (1977) (even though company official stated at meetings that all benefits were negotiable and "could go up or down," bargain-from-scratch statements were coercive due largely to contemporaneous use of transparencies projected on screen which indicated that bargaining would begin without any existing benefits). These factors gave Springstroh's statements a much more significant character than that attributed to them by the Company, which contends without merit that these statements were merely replies to Union misrepresentations that the employees could not lose anything as a result of bargaining.

Supervisor Leitner's "blank-piece-of-paper" statements, made during his informal discussion with a few employees two days before the election, implied a similar threat of a regressive bargaining posture in the event of unionization. Leitner's statements were made contemporaneously with the statements made by Springstroh, and were merely reiterations of the threats implied in Springstroh's statements.

Accordingly, we uphold the Board's findings that the Company, in violation of § 8(a)(1), threatened its employees with the assumption of a regressive bargaining posture in the event of a Union victory in the election.

### III.
### Conclusion

We conclude that substantial evidence supports the Board's findings that the Company violated § 8(a)(1) by engaging in coercive interrogation and solicitation, and by threatening plant closure, job loss, promotion loss, and a regressive bargaining posture. We therefore uphold the order of the Board and order its enforcement.

ENFORCED.

POLITZ, Circuit Judge, dissenting:

Respectfully, I dissent from the majority's conclusion that the acts of the petitioner-employer (TRW) justify the heavy hand laid upon it by the Board. Although recognizing that ours is a limited scope of review with only substantial evidence necessary to support the Board's findings, my review of this record results in findings and conclusions which differ markedly from that of the majority. I find the credible evidence fails to justify the setting aside of the election results and the other relief ordered by the Board. For purposes of clarity, the headings in the majority opinion are used in the notation of my principle objections.

### A. Coercive Interrogation

The ALJ, Board and majority found coercive interrogation. The ALJ and Board found eight instances; the majority found two, noting that it was questionable whether the others were supported by substantial evidence. I do not share the majority's hesitance or uncertainty; the instances glossed over are *not* supported by substantial evidence. For example, a new supervisor, Gisela Wilson, called an employee, George Thomas, into her office to inquire how he felt about the union. According to Thomas, he told her that he had not made up his mind. Wilson responded that it was

his decision to make and she apologized for asking. Incredibly, the ALJ concluded: "I find that her interrogation of Thomas was coercive."

Other equally "compelling" examples of coercive interrogation found by the Board include two instances of a supervisor asking an employee what he thought about the union, one instance of a supervisor asking an employee what he thought about the company, a supervisor asking an employee if he was going to a union meeting, and a supervisor telling an employee who had been wearing a union badge: "I see you don't have your badge on today."

The majority opinion focuses on conversations between Safety and Training Director Sam Wyse and employees Milton Andrews and Willie Sutton. None of these three were employed by TRW at the time of the hearing before the ALJ. Wyse did not testify, and the testimony of Andrews and Sutton is singularly unimpressive. I conclude that they in fact were not coerced by their conversations with Wyse, nor were these conversations reasonably likely to coerce or intimidate these men. Wyse tried to pump Sutton about union activities; he got nowhere. If anyone were intimidated in that discussion, it obviously was not Sutton.

The conversation with Andrews is equally insipid with one minor exception, a mote which became a beam in the eye of the ALJ and Board. Wyse inquired of Andrews of the attitude of the employees. Wyse wanted to know what the employees thought of *him*. I admit to a total failure of comprehension how this could possibly constitute coercive interrogation. Wyse was not circumspect, he asked Andrews to go to union meetings and brief him on what "was going on." Andrews refused and that was the end of that episode. Wyse should not have asked, but he got an unqualified answer which concluded the matter. This does not rise to the level of misconduct sufficient to set aside an election.

The conversations detailed in the ALJ findings, more particularly the whole of the conversations as contained in the transcript, are representative of the hyperbole and rhetoric neither foreign nor uncommon to an election contest. There were things which should not have been said on both sides, but these instances of excesses did not so permeate the election atmosphere as likely to lead to an impermissibly distorted result.

### B. Solicitation to Report on Union Activities

This incident has already been alluded to. Wyse asked Andrews to attend union meetings and, in the language of the majority, "report to management the activities of the Union." Wyse should not have done this. As noted, Wyse did not testify. It is impossible to know with certainty his purpose, motivation or intent from this record. Regardless, this impropriety does not justify today's ruling.

### C. Threats of Plant Closure, Job Loss and Loss of Promotion

Much is made about these allegations, but as I view the evidence, it merely points to the rhetoric and semantic excesses of a moderately heated election campaign. I conclude that the record does not support the finding that anything said or written by TRW representatives could reasonably be interpreted as (1) a threat to close the plant, (2) a threat of job loss, or (3) a threat to loss of promotion if the employees voted union. Spectres were raised by both sides. As the ALJ correctly concluded regarding a number of other allegations, this was all part of the election campaign and the employees could sort it out, just as is done in other election matters. Much is also made of the October 7, 1977 letter which TRW sent to its employees in response to a letter dated September 30, 1977 which the Union had sent to the employees. That letter ended with the exhortation: "We, therefore, ask you not to sign a Union Card or anything else until and unless you know exactly what your obligations and liabilities will be if you do." It strains credulity that this statement is found to be evidence of an unfair labor practice. I find it to be sound advice to be offered in any situation: know what you are signing, and its effects, before you sign.

### D. Threats of a Regressive Bargaining Posture

Finally, TRW is faulted because its manager, Roland Springstroh, and a supervisor made statements in which they purportedly threatened to take a regressive or intransigent bargaining position if the Union were successful in the election. I am in total disagreement with this finding. It is correct that these men informed the employees that bargaining sessions would begin "from scratch" and that the negotiators would start with a "blank sheet of paper," the latter statement being graphically demonstrated by holding up a blank sheet of paper. This plain vanilla bit of dramatics somehow becomes unclean and then illegal. I believe it to be neither.

Critical evidence in this aspect of the dispute was noted by the ALJ, who referred to the testimony of Springstroh telling the employees that "during negotiations, wages and benefits could go up, remain the same, or go down." An editorial in the company newspaper contained the same statement and testimony of employees corroborated Springstroh.

I differ with my colleagues in the majority when they conclude that the "blank paper" and "bargain from scratch" scenario constitutes an unfair labor practice which warrants the Board's order.

### Conclusion

The ALJ's findings of coercive interrogation are purely conclusory. He failed to follow the test first enunciated in *Bourne v. N. L. R. B.*, 332 F.2d 47 (2d Cir. 1964), and subsequently adopted by this circuit and underscored on several occasions. *See Federal-Mogul Corp. v. N. L. R. B.*, 566 F.2d 1245, 1250 (5th Cir. 1978), and cases there cited. The majority opinion attempts to fill this void in a careful and scholarly manner. I remain unconvinced.

Today's holding is inconsistent with our prior decisions, particularly the holdings in *Paceco v. N. L. R. B.*, 601 F.2d 180 (5th Cir. 1979), *Delco-Remy Div., General Motors Corp. v. N. L. R. B.*, 596 F.2d 1295 (5th Cir. 1979), and *Federal-Mogul, supra*. In *Feder-al-Mogul* we refused to enforce an order of the Board which was based, *inter alia*, on alleged coercive interrogation and statements. The *Federal-Mogul* court noted the ALJ's failure (actually refusal) to apply the *Bourne* test. In *Delco-Remy* we denied enforcement of an order ostensibly based on coercive interrogation, soliciting aid against the union, and threatening discharge. The *Delco-Remy* court did not find these charges supported by substantial evidence. In *Paceco* we vacated an order of the Board and remanded for failure of the Board to set forth the legal standards by which it determined that the interrogation was coercive. The *Paceco* court again underscored the viability of the *Bourne* standards which the Board had failed to apply, just as the ALJ and Board failed in the case at bar.

Based on my appreciation of the credible evidence in this record and my understanding of the teachings of our prior jurisprudence, particularly the trilogy cited in the foregoing paragraph which I find controlling and dispositive, I would deny enforcement of the Board's order. Accordingly, I respectfully dissent.