## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## RILEY–BEAIRD, INC., Respondent.

### No. 81–4398.

United States Court of Appeals, Fifth Circuit.

Aug. 6, 1982.

Elliott Moore, Deputy Assoc. Gen. Counsel, Jolane A. Findley, N.L.R.B., Washington, D. C., for petitioner.

Henry T. Arrington, New Orleans, La., for respondent.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

CLARK, Chief Judge:

The National Labor Relations Board (Board) seeks enforcement of its order against Riley-Beaird, Inc. The Board found that Riley-Beaird had coerced its employees in violation of section 8(a)(1), 29 U.S.C. § 158(a)(1), and ordered it to post a notice that it would cease and desist from such violations in the future. We affirm.

## I

In response to an organizational campaign by the Boilermakers Union, Riley-Beaird began a month-long campaign to convince its employees not to vote for the union. The campaign was marked by kick-off speeches, bulletins, and carefully orchestrated slide presentations. The Board found two of the slide presentations coercive. The first presentation concentrated on the Boilermakers' record at other plants, Fabsteel and ACRA Electric, and on the uncertainties of the bargaining process. The company officials who presented the show acknowledged that the Boilermakers had been able to achieve some benefits for workers they represented, such as improved lighting. However, these officials also noted that workers at these other plants were paid less than the employees at Riley-Beaird. They suggested that the Boilermakers had bargained away higher salaries for better lighting. The officials then told the employees that:

we could scratch the name, Fabsteel [from the collective bargaining contract] and insert Riley-Beaird. But, that we were a larger and bigger company than Fabsteel and, that we had as good or better negotiators. Therefore, we start with a blank piece of paper . . . . I stated that we at Riley-Beaird, would negotiate with the Union in good faith. However, you must remember, that in any negotiation all benefits are put up in the middle of the table. They could [go] up or they could go down and, we all start with a blank sheet of paper. I have negotiated thousands of different types of contracts and they all started with a blank sheet of paper.

At the second slide presentation, company officials reiterated that bargaining could result in either a gain or loss of benefits and that an impasse in bargaining could lead to a strike and lost jobs. They noted a strike in Alabama during which strikers had in fact lost their jobs. To convince the employees that they would not be immune from such occurrences at Riley-Beaird, they reviewed the company's history of labor relations, focusing on four plants. They explained that the Riley Company had bought the Beaird plant in Shreveport after a Riley plant in Pennsylvania voted for the union. Although the plant closing in Pennsylvania was attributed to "business and economic reasons," the only reason that was explained was the union's strikes at the plant.

The show also featured the Riley Company's union relations at its Sapulpa plant in Tulsa, Oklahoma. The Sapulpa plant had also been bought when Riley left Pennsylvania and was unionized at the time it was purchased. The presentation stated that "the first time the Riley Company [negotiated] with the union, one of the most violent strikes in Oklahoma history occurred." The presentation then detailed the events of the strike and the costs to the workers. The third company noted was the Riley foundry in Detroit. This presentation showed a unionized plant which had been

closed because it was an antiquated facility. The message articulated by the officials was that unions could not provide job security.

The final plant featured, the Cashco plant, was reminiscent of the first. When this plant went on strike, it was closed because of "business and economic determinations." Again, however, the only reason shown to the employees for the closing was the union's strike. The company closed its presentation with the disclaimer that it did not want history to repeat itself but that the only way the employees "can guarantee the same thing won't happen here is to make sure that the Riley-Beaird plant remains nonunion...."

The Board found that despite Riley-Beaird's protestations of good faith, the message presented was clear. "[T]he pervasive theme of [Riley-Beaird's] campaign was the inevitability of bargaining table disagreement, resultant strike, and the ready alternative of plant closure and removal. [This] constituted ... an implied threat to the employees that selection of the Union as their collective-bargaining representative would result in closure of the plants...." The Board also found that although the first slide presentation on bargaining might be acceptable under earlier Board decisions, the fact that it was coupled with a threat to close the plant rendered it coercive.

Riley-Beaird argues that the Board's decision impinges on its constitutionally protected right of free speech. Congress has recognized, however, that an employer's expression is protected only so long as it contains " 'no threat of reprisal or force or promise of benefit' in. violation of § 8(a)(1)." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 616–17, 89 S.Ct. 1918, 1941–42, 23 L.Ed.2d 547 (1969) (quoting 29 U.S.C. § 158(c)). Thus, the issue before us is not where to draw the line separating protected from unprotected speech. That line is settled. The only issue is whether the Board correctly determined that Riley-Beaird's conduct constituted a violation of section 8(a)(1). In making this inquiry, we are guided by our decision in *TRW-United Greenfield Division v. NLRB,* 637 F.2d 410 (5th Cir. 1981).

In *TRW–United Greenfield Division v. NLRB,* 637 F.2d at 419, we recognized that while an employer may predict that a plant will close if it is unionized, that statement must be capable of proof. In *TRW,* as in this case, the issue was not whether the employee could prove that the plant would close but whether there was substantial evidence that its statements actually amounted to such a prediction. *TRW* found substantial evidence in two instances. First, a statement in a letter to the employees that another company plant had been closed down after being unionized was deemed to be sufficient evidence. *See id.* at 419. Additionally, *TRW* noted that a statement that the company had previously closed one plant because of excessive union demands and would do so again was found to constitute substantial evidence. *See id.* at 420. *TRW* controls this case. The statements made in this case were as suggestive as those made in *TRW* and, under the evidentiary standard established in that case, constitute substantial evidence for the Board's findings.

With respect to Riley-Beaird's statements that bargaining would begin from a blank sheet of paper, *TRW* again is controlling. *TRW* found that although this statement may be benign, it carries with it the seeds of a threat. 637 F.2d at 420–21. Thus, the presence of contemporaneous threats or unfair labor practices can be sufficient to tip the balance against the employer in close cases. *See id. TRW* thus commits this court to approve the analysis and conclusion which the Board employed in this case based on the present record.

Our conclusion that the Board must be affirmed is also supported by the context in which the statement was made. The company official presenting the slide show noted that the contract negotiated by the Boilermakers and Fabsteel had resulted in lower benefits at Fabsteel than those in existence at Riley-Beaird. He then stated that

Riley-Beaird could simply agree with the union to adopt the less desirable Fabsteel contract but that Riley-Beaird had more economic resources than Fabsteel and better negotiators. The clear import of this statement was that at best the employees would emerge with a contract similar to Fabsteel's and at worst that Riley-Beaird's superior resources would result in even lower employee benefits. This threat of a regressive bargaining posture confirms the Board's finding that Riley-Beaird's references to bargaining were coercive.

## II

The Board also found that Riley-Beaird's supervisors had conducted three coercive interviews. The first occurred when M. O. Green, a company superintendent, approached Cecil Sanders, an employee, and asked him how things were going. Sanders replied that there were "several things [he] wasn't satisfied with." Green then told Sanders that he had noticed him handing out union literature and had wondered what was wrong. After Sanders listed several grievances, such as no overtime work on Saturdays, Green responded that he would see what he could do. It is undisputed that for the next several weeks Sanders was given overtime work. The Board found that although Green's opening remark was innocuous, he subsequently related his inquiry to Sanders' union activity and invited him to explain the source of his problems. The Board found that this inquiry, coupled with Green's promise to remedy Sanders' problems, constituted a solicitation of grievances.

Riley-Beaird contends that this colloquy does not constitute an illegal solicitation since Green's opening remark—"How are things going?"—was innocent and since his subsequent comments naturally flowed from Sanders' responses. We disagree. The Board could reasonably conclude that Green's subsequent inquiry about the problems leading to Sanders' union sympathies and his promise to remedy them constituted an illegal solicitation of grievances.

The second incident which the Board found to be coercive occurred between Green and Thomas Stamper. Green approached Stamper, who was talking to another employee, Danny Young. The Board found that Green asked Stamper, a known union sympathizer, if the union were going to win the election and what the company had done to create Stamper's union sympathies. While the Board did not find the question about the election results coercive, it did object to the inquiry into the source of Stamper's union sympathies.

Riley-Beaird argues that the Board incorrectly quoted Green since there was no testimony that Green ever asked Stamper what Riley-Beaird "had done to him to create his union sympathies." The difficulty with this argument is that neither the Administrative Law Judge (ALJ) nor the Board suggested that this statement was an actual quote. It instead summarized the testimony which had been given at the hearing. Riley-Beaird's argument is thus premised on an incorrect factual assumption.

Riley-Beaird also contends that the Board erred in crediting Stamper's testimony while discrediting Green's and Young's testimony. We are of course bound to accept the ALJ's credibility determinations unless clearly erroneous. *See NLRB v. Varo, Inc.,* 425 F.2d 293, 298 (5th Cir. 1970).

Green testified that when he approached Stamper and Young he only spoke with them about mortgage payments and did not ask how the union was "looking" or what Riley-Beaird had ever done to Stamper. The ALJ noted that Green's version of the events conflicted with both Young's and Stamper's testimony who testified that Green had asked how the union campaign was "looking." The ALJ discredited Young's testimony since he found Young's answers appeared calculated to dispel any anti-union bias in Green's remarks. The ALJ also noted that Young's credibility was put in doubt since he twice denied, and then admitted, that he had previously discussed his testimony with Riley-Beaird's counsel. Although the record certainly provides the

barest sort of support for the ALJ's credibility choices, we cannot say that they are clearly erroneous.

The final conversation found to be coercive occurred between Thomas Britain, a department foreman, and Willie Hall, a welder. Britain invited Hall to come into his office where Britain began to question Hall about the reasons for Hall's union support. Britain asked why Hall thought the union could help him when it had not done so at another plant. He also asked why there were so many "disturbed" workers in the plant. The Board found that these questions constituted an interrogation within section 8(a)(1).

We find that this issue is extremely close. Although the conversation began with a discussion of the union, it later turned to other subjects such as religion. Moreover, Hall appears to have responded to Britain in a straightforward manner. However, the conversation was initiated by Britain and took place in his office, not in the work area. Not only were the questions themselves intrusive, but the atmosphere that was generated by Riley-Beaird's campaign made the interview more coercive. The company's intensive campaign to discourage its employees from voting for the union converted what might otherwise appear to be harmless questions into direct challenges to an employee's union support. While the evidence does not point unwaiveringly to one conclusion, substantial evidence supports the Board's determination.

■ Because Riley-Beaird has complied with the object of the enforcement proceeding by posting the notice required by the Board, the question of mootness is raised. In *NLRB v. Raytheon Co.*, 398 U.S. 25, 27, 90 S.Ct. 1547, 1549, 26 L.Ed.2d 21 (1970), the Supreme Court recognized that compliance did not necessarily render an enforcement proceeding moot. Instead, a proceeding is moot only when "there is no reasonable expectation that the wrong will be repeated." *Id.* In making the determination that a case was not moot, the Court paid substantial deference to the Board's determination to seek enforcement of its order.

*See id.* We note that during the administrative proceedings the Administrative Law Judge stated that Riley-Beaird had refused to comply with a subpoena, a refusal which he found "reprehensible and contumacious." Moreover, at oral argument, counsel for the Board stated that proceedings against Riley-Beaird for other violations stemming from the organizational drive were pending before this circuit. Riley-Beaird's conduct does not give "assurance that its violations will not be repeated in the future." Accordingly, the Board's order is

ENFORCED.