**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MODERN CARPET INDUSTRIES, INC., Respondent.**

No. 78–1749.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 27, 1979.

Decided Dec. 28, 1979.

Edward S. Dorsey, N. L. R. B., Washington, D. C. (Andrew F. Tranovich, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on the brief), for petitioner.

Sam Sexton, Jr., Fort Smith, Ark., for respondent.

Before DOYLE and McKAY, Circuit Judges, and BROWN,[*] District Judge.

WILLIAM E. DOYLE, Circuit Judge.

This is an enforcement proceeding which has been filed by the NLRB. It seeks to enforce its order against the Modern Carpet Industries, Inc., respondent herein. The order of the Administrative Law Judge was substantially adopted by the Board with the exception of one paragraph which ordered the respondent to cease and desist from discharging employees for protesting what they feel to be hazardous working conditions or in any other manner restraining or coercing its employees in the exercise of their right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purposes of collective bargaining granted by § 7 of the Act.

The respondent was ordered to take the following affirmative action, all of which were found to be necessary.

(a) Offer J. B. Clough, Donald T. Dickson and Frank Ball immediate and full reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges, and to make them whole for their loss of earnings by paying to them sums of money they normally would have earned absent the discrimination, less net earnings with interest to be computed in accordance with the cases cited in the opinion.

(b) Respondent was directed to post at its Poteau, Oklahoma operation copies of a notice. Copies of the notice on forms provided by the Regional Director for Region 16, after being duly signed by an authorized representative of the respondent, were directed to be posted by respondent upon receipt thereof and to be retained for 60 consecutive days in conspicuous places. Further, reasonable steps were to be taken to assure that the notices were not altered, defaced or covered by any other material.

(c) Finally, respondent was directed to notify the Regional Director for Region 16, in writing, within 20 days from the date of the order of the steps the "Respondent has taken to comply herewith."

The three employees who were fired, that is Clough, Dickson and Ball, were maintenance department employees. One Jim Sanders was the supervisor, while Davis Helms was plant manager and Phil Stillman was company president.

Included in the plant operation was the use of carpet tufting machines which are stabilized by use of lead. This lead is melted and poured around the base of the machines to prevent vibration. The lead is obtained ordinarily in the form of bars from metal dealers. Maintenance department employees melt the lead bars for pouring at the plant.

On August 25, 1977, the supervisor Sanders told Clough and Ball that he had obtained a considerable quantity of lead, 400 pounds, which had been used by a hospital to store radioactive cobalt and radium. Clough happened to mention to his wife, a nurse, that he would be required to work with this lead. She told him that this lead was very dangerous since it had been used to store radioactive materials. During the ensuing period, Clough talked with Dickson and Ball about the lead and communicated to them that which his wife had said about working with this lead.

Sanders told Ball, Dickson and Clough that they were going to melt and pour the lead. Ball told Sanders that he did not

* Of the District of Kansas, sitting by designation.

want to work with the lead because "it possibly could be dangerous from radioactivity." Clough also told Sanders that he "won't be around when it is poured" because he "was afraid it was radioactive material." The employees did assist Sanders in making preparations to melt and pour the lead and then left work at the normal quitting time that afternoon.

The next day, August 31, they reported for work and at that time Sanders told Clough, Dickson and Ball that they either had to melt and pour the lead or else be fired. Ball asked if the lead had been checked for radioactivity to which Sanders replied that he had called someone about the lead the night before and that person had assured him that the lead was safe. Ball asked for the name and telephone number of the person that Sanders had contacted. Sanders then admitted that Jess Pair, the company comptroller, had actually made the call about the lead.

Clough sought a signed statement from the president in which he would assume responsibility for any radioactive contamination which they sustained while working with the lead. Sanders said that he did not think that Mr. Stillman would give such a statement. Ball told Sanders that he did not want to work with the lead unless it was tested because he understood that the lead was unsafe. Dickson wanted it tested also because he "didn't want to work with something he couldn't see or feel until it was too late." Sanders said, in view of that, they were all fired.

Ball then requested that Sanders furnish the name and telephone number of the person with whom Pair had spoken about the lead. Sanders referred them to Pair who, in turn, told them that the lead was not dangerous, that it had shielded isotopes of molybdenum which had a half-life of 48 hours, that the seller had to wait three months before selling the lead under government regulations, and that radiation could not penetrate the lead, but Ball again asked Pair for the name and telephone number of the person he had spoken to about the lead. Still Pair would not reveal

his identity, but told them to get the information from Sanders. Ball, Dickson and Clough continued to be apprehensive about the threat of radioactive contamination. They left work to avoid having to work with the lead.

On September 1, all three were given termination checks which included their pay through August 31. Two days later, all three of them received a written notice of separation which stated that they were discharged for insubordination, violation of company rules and failure to follow instructions.

Following an extensive hearing, the Board found that the company had violated § 8(a)(1) of the National Labor Relations Act by discharging Ball, Dickson and Clough because their refusal to work with the lead was concerted protected activity inasmuch as the source of their concern was a work condition which they believed to be dangerous. They were discharged solely because of their refusal to work with this lead. Based on this, the Board ordered the company to cease and desist from the unfair labor practices found to exist and to offer reinstatement to Ball, Dickson and Clough together with back pay.

 A fundamental provision of the Act is § 7, which provides that employees shall have the right to engage in concerted activities for the purpose of mutual aid or protection. This provision is implemented by § 8(a)(1), which declares that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by § 7. The prohibitions contained in these two provisions prevent discharge or other employer retaliation for engaging in concerted activities for mutual aid or protection even though no union activity is involved or collective bargaining is contemplated. Employees who refuse to work and who absent themselves from their employer's premises in protest over wages, hours, or other working conditions are engaged in concerted activities for mutual aid or protection within the meaning of § 7.

The defense of Modern Carpet contained in its answer was, first, that the employees had been laid off because of economic necessity, and secondly, that the three employees walked off the job and thereafter failed to report for work. The more important defense, however, which they assert is that Mr. Pair ascertained by telephone that the lead was free of contamination and safe to use. The respondent contends that when it gave this information to the employees that ended the matter; that they knew then that it was safe and therefore they had no right to refuse to work with it. The effort at trial was to establish that the three were not under real apprehension; that it was feigned. The Administrative Law Judge concluded that it was not necessary to a concerted walkout by the employees in question that their fear was reasonable if, as a matter of fact, it was real. The judge continued that the source of their concern was a condition on the job which they believed to be dangerous and that if this belief was in good faith, the allegations in the complaint were sufficiently proved.

■ The cases hold that the merits of the underlying dispute are irrelevant to the determination of whether a "labor dispute" exists or not. In *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), the Supreme Court reversed the Court of Appeals which had refused to enforce an NLRB order. The NLRB had ordered the employer, Washington Aluminum Co., to reinstate and make whole seven employees who were discharged for leaving their work in the machine shop without permission. Their claim was that the shop was too cold to work in. Evidence was presented before the Board which showed that the shop was not well heated, and on the day of the walkout the furnace had broken down and the outside temperatures were between 11° and 22°. The Supreme Court ruled that the employees were not bound to demand that the condition be remedied; that the walkout grew out of a labor dispute within the meaning of § 2(9) of the Act; and that their discharge was unjustified, despite the existence of a plant rule prohibiting employees from leaving their work without permission. In its opinion the Supreme Court said that "reasonableness of workers' decisions to engage in concerted activity is irrelevant to the determination of whether a labor dispute exists or not." 370 U.S. at 16, 82 S.Ct. at 1103.

See also *Du-Tri Displays, Inc.*, 231 NLRB 1261 (1977). The condition complained of by the employee here was lacquer fumes which were present in the plant. There was a threat to obtain a National Institute of Occupational Safety & Health study for the benefit of all of the workers. The NLRB held that the fact that the fumes did not present a health hazard did not render unprotected the efforts to remove what was honestly believed to be a danger.

See *Alleluia Cushion Co., Inc.*, 221 NLRB 999 (1975). Here an employee was discharged for reporting lack of safety conditions to OSHA. It was said that there was a sort of constructive, concerted action because he was acting on behalf of other employees.

See also *Ben Pekin Corp.*, 181 NLRB 1025 (1970). The order of the trial examiner that the employer had violated § 8(a)(1) in discharging an employee for accusing the president of the company of bribing a union agent to obtain a wage increase less than what was required by the union contract was adopted by the NLRB. The NLRB stated that the actual amount of the pay increases was not the critical factor; rather, what was critical was the employee's good faith in his actions. The NLRB found that the employee was acting in good faith at all times, and therefore his conduct fell within § 7. The NLRB found that the employee's activities could fall within § 7, even though the employee was laboring under a mistake of fact. 181 NLRB at 1025.

■ The only question of fact then that was presented was whether or not the employees in good faith believed that working with the radioactive lead was dangerous. There is every reason to believe that they were in good faith. There was no reason to suspect that they were not. The company

did not act with intelligence in the matter. If indeed the lead was harmless, management could at least have told the employees who had made the appraisal or, better still, could have made a statement in writing assuming liability for any harm that might be sustained. The employees offered to work with it after the lead was tested.

From the foregoing, it is apparent that the only issue in the case was one of fact, namely whether the employees acted upon a genuine fear. The evidence supported the finding of the Administrative Law Judge, affirmed by the Board, that this was the situation. Consequently, the concerted effort on their part must be upheld.

We conclude that the order of the NLRB is entitled to be enforced. It is so ordered.