**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BREWTON FASHIONS, INC., A DIVISION OF JUDY BOND, Respondent.**

No. 81–7027.

United States Court of Appeals,
Eleventh Circuit.

Aug. 13, 1982.

Penny Pilzer, Atty., N. L. R. B., Washington, D. C., for petitioner.

Allan H. Weitzman, George G. Gallantz, New York City, Joan McAvoy, Washington, D. C., for respondent.

Before FAY, VANCE and ARNOLD *, Circuit Judges.

ARNOLD, Circuit Judge:

The National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e), applies for enforcement of its order[1] against Brewton Fashions, Inc., a division of Judy Bond. The Board found that Brewton had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by interrogating its employees about their union activities, by creating the impression of surveillance of those union activities, and by threatening its employees with discharge because they engaged in such activities. The Board also found violations of §§ 8(a)(3) and (1), 29 U.S.C. §§ 158(a)(3) and (1), in the discharge of two employees, Kathleen Chavers and Grace Boozer, for their protected, concerted activities. We enforce the Board's order.

I.

Brewton Fashions manufactures women's blouses in Brewton, Alabama. In 1963, the Board found the company in violation of the NLRA by discriminatorily discharging ten employees, one of whom was Kathleen Chavers. The employees were later reinstated.[2]

Since 1978, Brewton has pursued a campaign to improve the efficiency of its plant. Some jobs were abolished, and certain tasks were consolidated within the remaining job descriptions. In March 1979, Kathleen Chavers was informed that in addition to her duties as a trimmer in the cutting room, she would have to push a cart loaded with her finished material into the sewing room. She pushed the loaded cart on one occasion, but then complained that it was too heavy and that she was unable to perform the task alone. Subsequently, a fellow employee, Grace Boozer, volunteered to help Chavers push the cart to the sewing room, and together they unloaded its contents.

On March 30, Plant Manager Robert Bays called Chavers and Boozer to his office and inquired why they refused to do their assigned work, i.e., pushing and unloading the cart individually. Both employees told Bays that they were physically unable to push the cart alone. Bays reprimanded Chavers and Boozer and told them to think about the matter over the week end. He gave them a choice of either performing the job as directed or not returning to work at all on Monday.

---

* Honorable Richard S. Arnold, U. S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The Board's decision is reported at 252 N.L. R.B. 148 (1980).

2. The case is reported at *Brewton Fashions v. NLRB*, 361 F.2d 8 (5th Cir.), *cert. denied*, 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75 (1966).

Chavers and Boozer reported to work on Monday, April 2, but continued to push the cart together. Later that day, they were again called into Bays's office and asked whether they intended to perform the job separately. Both employees responded, as before, that they were physically unable to do the work as directed. After some discussion, the Vice-President of Manufacturing, James Byrd, joined the meeting. There is some dispute over what actually transpired during the rest of the meeting,[3] but it is agreed that Chavers and Boozer continued after March 30 to push the cart together despite the repeated requests of their immediate supervisor, Charles Hawkins, to push it alone.

During April, 1979, another employee, Louise English, contacted the union through the aid of Kathleen Chavers, and on April 17 a union[4] representative arrived at Brewton to begin an organizational drive. Brewton admitted that it was aware in April of the union's activities and that it knew Chavers and Boozer were involved with the union at that time. During this period, Supervisor Hawkins had a discussion with Grace Boozer about the union. He told her that the union had closed the plant where he had worked in Mississippi. Boozer replied that she did not believe that the union would close the company's plant in Brewton. Hawkins concluded the conversation with the remark, "Well, it will close the plant for you."

On April 23, Chavers and Boozer met with vice-president Byrd in his office and again protested that they were physically unable to push the cart alone. Byrd responded by telling the two employees that he did not care how they worked the job out, but that Chavers and Boozer had to do the job as it was outlined, which meant pushing the cart individually.

Another Brewton employee, Helen Pugh, spoke with Mr. Byrd in his office on April 25. Byrd told Pugh that he had heard that she had been seen passing out "recipe cards." He further stated that they had "a girl that would testify in court that you were passing out recipe cards during working hours." Tr. 141. Pugh admitted to passing out *union* cards but stated that this had been done before working hours. She also mentioned that she had been with the union before and knew that she could lose her job for distributing union cards on company time. Byrd agreed, saying "you're right, you could," and "we don't want [the union] down here, we don't need it and we don't intend to have it." Tr. 142. Pugh had worked for Brewton for seven years, but this was the first time she had ever been called to the vice-president's office.

Around May 3, Byrd held a meeting in his office with employees from each section of the company. He discussed such topics as plant production and hospital insurance. During the discussion, one employee commented that if the employees had had a union, they would have had a retirement plan. Byrd responded by stating that "the union is really not interested in getting you a retirement plan." Tr. 315. He then reached into his desk drawer and pulled out a flyer which had printed on it the words, "Don't Buy Judy Bond Blouses." After that, Byrd told the employees that "you think someone[,] a union would want to give you insurance and help you when they are saying don't buy Judy Bond blouses." Tr. 316. Byrd admitted, however, that the flyer had been printed at least 16 years earlier.

Byrd made a speech over the plant's public address system sometime in June, 1979, in which he complimented the employees on their job performance during the first six months of the year. He then proceeded to relate that some people had asked him "how

---

**3.** Chavers and Boozer stated that they understood Mr. Byrd to tell them to "both go back up there and work together and push the buggy together." Tr. 79. On the other hand, witnesses for the company testified that Chavers and Boozer indicated that they would try to perform the job individually, and that Byrd told them to try that and, if they had any problems, to inform their supervisor, Charles Hawkins.

**4.** International Ladies' Garment Workers' Union, AFL–CIO.

to get rid of some strangers that were coming to their house." Tr. 313. Byrd informed the employees that they did not have to permit anyone to enter their homes whom they did not wish to be there. He further told the employees that anyone allowed to enter could be asked to leave and, if anyone refused, the employee could contact the sheriff or police department. Byrd mentioned that he had been advised that some employees were complaining about strangers visiting their homes and staying until 11:00 at night.

On June 18, 1979, Chavers and Boozer were called into the plant manager's office and were terminated when they once again refused to push the cart alone.

The Board found that Brewton Fashions had engaged in unfair labor practices within the meaning of §§ 8(a)(1) and (3) of the National Labor Relations Act and ordered reinstatement of the discharged employees and other remedial measures. The company, in opposition to enforcement of the Board's order, argues that the finding of the Board that Brewton Fashions violated § 8(a)(1), based on comments contained in a single conversation between vice-president Byrd and Helen Pugh, is not supported by substantial evidence on the record. It also contends that Brewton Fashions lawfully terminated Chavers and Boozer and that the Board's findings that these terminations violated §§ 8(a)(1) and (3) are not supported by substantial evidence on the record as a whole.

## II.

■ Section 8(a)(1) of the National Labor Relations Act makes it unlawful for an employer to "interfere with, restrain or coerce" employees in the exercise of their right of, *inter alia*, self-organization under § 7 of the Act,[5] 29 U.S.C. § 157. A violation of § 8(a)(1) occurs when an employer's questions, threats, or statements tend to be coercive and not only when the employees are in fact coerced. *TRW–United Greenfield Division v. N. L. R. B.*, 637 F.2d 410, 415 (5th Cir. 1981); *Delco-Remy Div., General Motors Corp. v. N.L.R.B.*, 596 F.2d 1295, 1309 (5th Cir. 1979). The coercive nature of an employer's conduct is to be determined in light of all the circumstances surrounding that particular instance of conduct. *TRW–United Greenfield Division v. N.L.R.B., supra*, 637 F.2d at 415–16; *N.L.R.B. v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 (5th Cir.), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980). On this basis, we examine the § 8(a)(1) violations found by the Board.

The Board found that vice-president Byrd's conversation of April 25 with Helen Pugh constituted illegal interrogation. Employer interviews or interrogations of employees are not *per se* violations of § 8(a)(1). *TRW, Inc. v. N.L.R.B.*, 654 F.2d 307, 314 (5th Cir. 1981). An interrogation becomes illegal only when "the words themselves or the context in which they are used ... suggest an element of coercion or interference." *Delco-Remy Div., General Motors Corp., supra*, 596 F.2d at 1309 (quoting from *N.L.R.B. v. Weingarten, Inc.*, 339 F.2d 498, 500 (5th Cir. 1964)). We often consider a number of factors[6] in determining whether the interrogation in question tends to be coercive. A proper evaluation of the evi-

---

**5.** Section 7 states in pertinent part:

Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

**6.** Among the factors considered relevant in evaluating the tendency of conversations to be coercive are:

(1) the history of the employer's attitude towards its employees; (2) the type of information sought or related; (3) the company rank of the questioner; (4) the place and manner of the conversation; (5) the truthfulness of the employee's responses; (6) whether the employer had a valid purpose in obtaining the information; (7) if so, whether this purpose was communicated to the employee; and (8) whether the employer assures employees that no reprisals will be taken if they support the union.

*N.L.R.B. v. Aero Corp.*, 581 F.2d 511, 514 (5th Cir. 1978).

dence, however, requires more than merely examining a list of factors since "[i]ntimidation may occur even if all factors cut in favor of the employer." *Sturgis Newport Business Forms, Inc. v. N.L.R.B.*, 563 F.2d 1252, 1256 (5th Cir. 1977).

■ Here, we are presented with a situation in which the vice-president of manufacturing called an employee into his office ostensibly to discuss whether she had been distributing "recipe" cards during working hours. This was the first time Helen Pugh had ever been asked to report to Mr. Byrd's office during her seven years of employment with Brewton. The Board was within its rights in finding that the purpose of the conversation was to elicit information from Pugh on whether she had been passing out *union* cards. Pugh admitted that she had been distributing union cards but stated that it was not done on company time. She also stated that she was aware she could lose her job for passing out union cards during working hours. Byrd confirmed Pugh's understanding of company policy on distributing union cards and then voiced his general opposition to the union's presence at Brewton Fashions. The Board found that Byrd's comments on Pugh's possibly losing her job because of union activity constituted a threat of discharge. We conclude that the context in which Byrd's comments were made, including his statement of opposition to the union, support this specific finding of the Board and the overall finding of illegal interrogation.

The comments of Byrd to Pugh during their conversation of April 25 were also found by the Board to create the impression of surveillance. "Creating the impression of surveillance of union activity can be as coercive as actual surveillance and, therefore, constitute an unfair labor practice." *N.L.R.B. v. Anchorage Times Publishing Co.*, 637 F.2d 1359, 1366 (9th Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1980). The impression of surveillance was created by Byrd's statements

that he had heard that Pugh had been seen passing out "recipe" cards and that the company had "a girl that would testify in court that [Pugh was] passing out recipe cards during working hours."[7] In view of all the circumstances surrounding these comments, substantial evidence supports the Board's finding that Brewton Fashions violated § 8(a)(1) of the Act.

### III.

■ We next review the evidence on the discharges of Brewton employees Grace Boozer and Kathleen Chavers. The Board found these discharges to constitute unfair labor practices under both §§ 8(a)(1) and (3) of the Act. Section 8(a)(3), 29 U.S.C. § 158(a)(3), provides that,

(a) It shall be an unfair labor practice for an employer

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

This provision is supplemented by § 10(c) of the Act, 29 U.S.C. § 160(c), which authorizes the Board to take remedial action but with the limitation that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."

Brewton Fashions argues that Chavers and Boozer were lawfully terminated for refusing to perform their work as directed. The refusal of the two employees to push the cart separately, the company contends, justified their discharge. The Board found, however, that Brewton's asserted basis for the employees' termination was pretextual, and that Chavers's and Boozer's discharges were the result of their "union and protected, concerted activities." Substantial evidence on the record as a whole supports the Board's findings.

---

7. Pugh's testimony that she had been distributing union cards *before* working hours was un-  rebutted by the company.

Chavers and Boozer were discharged at a time when Brewton's opposition to the presence of the union at the plant had become clearly evident.[8] Beginning with its initial knowledge of the union's organizational efforts in April 1979, the company, through its officials, expressed its displeasure on a number of occasions at the possibility of a union at its Brewton plant. The April conversation that Supervisor Charles Hawkins had with Boozer presented the first evidence of the company's opposition to the union. Hawkins told Boozer of a union's closing the plant where he had worked in Mississippi and further stated to her that "[the union] will close the plant for you." The Board found that Hawkins had threatened Boozer with closure of the plant if the union came in.

Vice-president Byrd's comment to Helen Pugh on April 25 is further evidence of Brewton's anti-union sentiments. His statement that "we don't want [the union] down here, we don't need it, and we don't intend to have it," clearly illustrates the company's opposition to union activity. Tr. 142. Byrd made other statements over the next two months that reinforced the company's position on the union's organizational efforts. In a meeting of plant employees in his office around May 3, he criticized the union, contending that it was not really interested in establishing a retirement plan for employees, and implied that the union sought to close the company, using an outdated union flyer as an example. Byrd's speech in June over the plant's public-address system provides further evidence of anti-union animus. His remarks concerning handling "strangers" visiting the homes of plant employees were obvious references to the union's attempts at organizing workers at Brewton.

Chavers and Boozer were terminated on June 18, after most, if not all, of these incidents occurred. The Board found that the timing of the employees' discharge rendered the company's motive suspect, particularly considering Brewton's awareness of Chavers's and Boozer's active involvement with the union and the fact that the two employees were first reprimanded for refusal to push the cart separately on March 30, nearly three months earlier. See *N.L.R.B. v. J. W. Mortell Co.*, 440 F.2d 455 (7th Cir. 1971). Brewton Fashions offers a different explanation for its termination of Chavers and Boozer on June 18. It argues that plant management made a conscious decision to permit the two employees to continue working at Brewton in the hope that their supervisor, Charles Hawkins, would succeed in persuading them to perform the job as directed. The company's position is not without support in the record. See Tr. 264–66. Brewton also contends that its final decision to discharge Chavers and Boozer came only after two other employees had complained about the "special treatment" accorded Chavers and Boozer.[9] We do not deny that the evidence presents a close question; however, "the Board is not required to establish substantial evidence that conduct is motivated *solely* by anti-union animus. It is sufficient if substantial evidence shows that the force of anti-union purpose was *'reasonably equal'* to the lawful motive prompting conduct," *N.L.R.B. v. Aero Corp., supra*, 581 F.2d at 514–15 (emphasis ours), and that discharge would not have occurred in the absence of protected activity. We conclude that the Board has met that standard here.

The Board also found that Chavers and Boozer had engaged in protected, concerted activity in protesting the company's demand that they push the cart separately. The Administrative Law Judge in his opinion, which was adopted by the Board, stated:

---

8. We specifically note, lest there be any misunderstanding, that Brewton may dislike the union as much as it pleases and may use every legitimate means of keeping a union out of its plant. What it may not do is discharge an employee because of her union or other protected, concerted activities.

9. There was evidence that employees Georgia Little and Jessie Mae Wilson had complained to James Byrd about Chavers's and Boozer's jointly transporting the carts. Tr. 16, 310–11.

There is no evidence which would demonstrate that Boozer or Chavers was insincere in their [sic] asserted belief that they [sic] would be hurt physically by pushing the cart alone. Each is a relatively small, middle aged woman and each had experienced serious health problems before the spring of 1979. The fully loaded cart weighed between 300 and 700 pounds and the wheels of the cart was [sic] often clogged by lint and material as it was pushed across the floor. Boozer and Chavers acted in concert when they went to Mr. Byrd on April 23, and protested that the job of pushing the cart alone was too much for either of them.

R. 344 (footnotes omitted).

Brewton Fashions contends that no protected activity was involved because the employees' conduct was to obtain an unlawful objective, was personal to Chavers and Boozer, and was not part of a group action. The company argues that the employees' refusal to push the cart separately was an effort to force Brewton to define jobs based on sexual stereotypes and therefore unlawful under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). See *Pond v. Braniff Airways, Inc.*, 500 F.2d 161, 166 (5th Cir. 1974). This argument is based on evidence that Grace Boozer stated to Mr. Byrd that pushing the cart was "too heavy for a woman" and that it was "a man's job." [10] These statements are, however, open to a different interpretation and actually may be supportive of the Board's findings. No evidence suggests that Chavers and Boozer had anything other than a genuine, good-faith belief that they would be physically injured by pushing the cart alone. And it may reasonably be inferred from her statements that Boozer believed that such work would be injurious to most

women at the plant.[11] So the employees' conduct may not have been purely personal to them. In addition, the fact that their conduct involved only two employees does not preclude it from being deemed concerted activity. See *N.L.R.B. v. C. J. Krehbiel Co.*, 593 F.2d 262 (6th Cir. 1979); *N.L.R.B. v. Modern Carpet Industries*, 611 F.2d 811 (10th Cir. 1979) (actions of three employees constituted concerted activity). We conclude that the Board's finding that Chavers and Boozer had engaged in protected, concerted activity is supported by substantial evidence.

Finally, the Board determined that Chavers and Boozer were treated differently from other Brewton employees who had also refused to push the cart alone. This finding was based on evidence that, in 1978, prior to the commencement of union organizing at the plant, employees Mary Nelson, Lois Hart, and Maxine Cunningham, were each asked to push the loaded cart alone, and each refused the request. None of these employees was disciplined as a result of her refusal to perform the job. Tr. 154–56. In addition, Louise English, who was also employed as a trimmer and bundler, was asked by plant manager Robert Bays, on the day Chavers and Boozer were discharged, if she wanted the job of pushing the cart. She declined, stating that her asthmatic condition prevented her from performing such strenuous work.[12] English was neither disciplined nor terminated because of her refusal. Tr. 166.

Brewton Fashions argues that there was no disparate treatment of Chavers and Boozer because none of the other named employees was similarly situated to them. The company notes that Nelson, Hart, and Cunningham were asked to push the carts in 1978, *before* the reorganization of jobs in

---

**10.** Robert Bays testified that Ms. Boozer said to Mr. Byrd:

> Well, Mr. Byrd, ..., I never have been for this women's lib[.] I never believed in it and I still believe that it's too heavy for me to do. It's a man's job, Mr. Byrd, that's all there is to it. It's a man's job.

Tr. 258. This testimony is uncontested; Ms. Boozer did not deny using those words. Tr. 66.

**11.** There was evidence that, at the Brewton plant, pushing the carts had been a task assigned, in the past, primarily to men. Tr. 28. Men also pushed the cart after Chavers and Boozer were terminated. Tr. 164, 197.

**12.** Louise English was not required by the company to submit a doctor's certificate attesting to her medical condition. Tr. 166.

the cutting room. None of these employees was assigned the particular task; they were simply offered the work because of a reduction in overall plant workload at the time.[13] Tr. 154–57.

The company contends that Louise English was not similarly situated to Chavers and Boozer because she was not employed as a trimmer on June 18, when the two employees were terminated and, therefore, the request to push the cart was not a specific assignment of the job. Tr. 170. Additionally, the company argues that if it had wanted to terminate union activists it could have terminated English on the same alleged pretext as Chavers and Boozer. English initiated the union organizing drive, and Brewton claims that it was aware of her activities.[14]

These arguments have some merit. The Board's finding here, as with many of its other findings, is obviously not supported by everything in the record. It may be that, presented with such fairly conflicting views, this Court would have made a different choice had the case been before us as triers of fact. In situations such as this, however, we may not displace the Board's choice with our own. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *N.L.R.B. v. Aero Corp., supra*, 581 F.2d at 514. We conclude that the Board's determination that Chavers and Boozer were disparately treated was supported by substantial, although not uncontradicted, evidence.

We hold that the findings of the Board that Brewton Fashions committed unfair labor practices are supported by substantial evidence on the record as a whole, and the Board's entire order is therefore EN-FORCED.

---

**13.** Because of lack of work, employee Mary Nelson was laid off for a period of five weeks after declining the cart-loading assignment. Tr. 157.

**14.** The Board stated that the record did not show that Brewton Fashions was aware of Louise English's union activities. James Byrd, however, testified that he had heard rumors that English was involved in union organizing. Tr. 19.