United States Court of Appeals,

Eleventh Circuit.

No. 95-3688.

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS & HELPERS, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

H.B. ZACHRY COMPANY, Petitioner-Cross-Respondent,

v.

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS & HELPERS, AFL-CIO, Respondent,

National Labor Relations Board, Respondent-Cross-Petitioner.

Nov. 13, 1997.

Petition for Review and Cross Petition for Review of the National Labor Relations Board. (Agency Nos. 12-CA-14962, 12-CA-14962-2 & 12-CA-15018)

Before CARNES, Circuit Judge, and HENDERSON and GIBSON[*], Senior Circuit Judges.

GIBSON, Senior Circuit Judge:

This case appears before us after the National Labor Relations Board (the "Board") upheld an Administrative Law Judge's ("ALJ") determination that the H.B. Zachry Company ("Zachry") committed numerous violations[1] of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 151-169 (1994). *See H.B. Zachry Co.,* 319 N.L.R.B. 967, 1995 WL 785175 (1995). The Board also upheld the ALJ's finding that Zachry's termination of employee Mathew Jonjock did not violate sections 8(a)(1) and (3) of the Act, as the General Counsel for the Board and the International

---

[*]Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]The ALJ determined that Zachry violated sections 8(a)(1) and (3) of the Act when it (1) discharged employee Scott French because of his activities in support of the Union, (2) reprimanded employee Russell Myers and failed to recall him from layoff because of his support for the Union, and (3) refused to consider applicants who wrote "volunteer union organizer" on their applications. The ALJ found additional violations of the Act which are not at issue on appeal.

Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forger & Helpers, AFL-CIO (the "Union") had alleged. On appeal, the Union petitions for review claiming that the Board erred in concluding Zachry's treatment of Jonjock did not violate the Act. Zachry cross appeals challenging several of the Board's determinations. The Board requests that we enforce its Order in whole. After considering the Board's Order and the arguments raised by each of the parties, we enforce the Order in part and deny enforcement in part.

I. BACKGROUND

This case arises out of the Union's attempt to organize employees working for Zachry at a construction site in Jacksonville, Florida. Zachry, as general contractor, began constructing a coal-fired power plant at the site in early fall of 1991.

On February 27, 1992,[2] a group of five employees, including Mathew Jonjock, went to Zachry's construction site where they met with Field Personnel Manager Kevin Evans. The group gave Evans a letter identifying themselves as a union organizing committee and announced their intent to organize workers at the construction site. Evans told the group he could not stop them from organizing but that they were to organize on their own time and were not to pass out union literature while working.

Jonjock worked as a boilermaker fitter/rigger from February 3 until Zachry discharged him on March 3. Jonjock apparently engaged in no significant union activity until the organizing committee met with Evans. After the meeting with Evans, Jonjock and other committee members began openly displaying their union affiliation and organizing committee membership status. On the morning of Friday, February 28, the organizing committee met with a Zachry project manager to request a place to wash their hands, a clean place to eat lunch, and a wage increase. The manager denied the requests.

Boilermaker/Rigger General Foreman Earl Roark testified that on February 28 he and Supervisor Earl Frederick assigned Jonjock to install four steel I-beams to an air-driven structural

_____

[2]All dates are from 1992 unless otherwise noted.

lifting device which would be used to lift a boiler into place. According to Roark, Jonjock was the fitter in a crew of three workers and was responsible for properly aligning the I-beams before they were welded. Nathan Hand was Jonjock's helper, and Donald Tuey was the crew's welder. Jonjock claims that Roark and Frederick had not assigned him these duties, but that Frederick had merely asked him to stand watch over a hole for thirty minutes while Roark's crew went to get tools and equipment. The ALJ credited Roark's testimony and determined that Jonjock had primary responsibility for ensuring the I-beams were properly aligned.

Jonjock apparently aligned the first I-beam improperly, and Frederick instructed Jonjock to reinstall the beam. After Jonjock and the other crewmembers reinstalled the first I-beam, and installed the second I-beam correctly, Jonjock improperly aligned the third I-beam. Roark and Frederick discovered that the third I-beam had been fitted improperly, but they did not ask the crew to take corrective action that day because reinstalling the I-beam would have taken several hours.

Boilermaker Superintendent Roger Reed testified that, at about 4:00 p.m. on February 28, Jonjock approached him and asked him what types of employee misconduct would result in termination. After Reed gave some examples, Jonjock asked whether a person would be terminated if they refused to go up on the steel beams. The two then briefly discussed Zachry's policy regarding working aloft the iron structure. Reed testified that Jonjock then stated that Zachry's safety policy "sucked" and that "everybody at the main office was [sic] a bunch of unorganized dumb asses." ALJ Hr'g Tr. at 131. Jonjock denies that this conversation occurred.

Around 5:30 p.m. on February 28, Frederick sent Hand onto the boiler structure to retrieve a piece of equipment. When Hand returned, Frederick told him he was going to issue a three-day suspension for going onto the structure without a safety belt. Jonjock overheard the conversation and protested to Frederick. Jonjock testified that Frederick instructed Hand and Jonjock to accompany him to the superintendent's trailer and told Jonjock, "[w]e're going to go get your money." ALJ Hr'g Tr. at 196. At that point, Reed and General Foreman Ronnie Stewart approached. While Frederick told Reed of Hand's suspension, Jonjock continued to speak in Hand's

3

defense. Reed told Jonjock to mind his own business and to wait for Hand in the parking lot. Reed and Stewart testified that as they were leaving the construction site that evening, they met Jonjock in the parking lot. Jonjock asked Reed if Reed would have his money on Monday. Reed said no and told Jonjock he had not been fired. Reed testified that Jonjock then responded, "You're too chicken shit to fire me." ALJ Hr'g Tr. at 141. Jonjock denied that this exchange occurred.

Reed testified that when he got home, he spoke with Frederick, who lived across the street, about the day's events. Reed learned that Jonjock incorrectly installed two I-beams that day. On Saturday, February 29, Reed and another superintendent met at the jobsite to inspect the I-beams. Upon seeing the I-beam that Jonjock installed improperly, Reed concluded that—based on Jonjock's poor work quality, bizarre questions about possible reasons for termination, and challenge to Reed to fire him—Jonjock acted intentionally in doing his work incorrectly. Reed called Evans to review the facts, and Evans telephoned his superior in San Antonio, Texas. The group ultimately decided that either Jonjock had intentionally committed these errors or that he was so lacking in skills he could not qualify as a boilermaker fitter/rigger. Therefore, they decided to terminate him.

When Jonjock reported for work on Tuesday, March 3, Frederick informed him that he had been terminated. Jonjock testified that as he approached Frederick, Frederick stated, "I terminated you yesterday.... Your organizing days is [sic] over, boy." ALJ Hr'g Tr. at 199. Frederick then instructed Jonjock to turn in his safety equipment and gave Jonjock his final paycheck and a termination slip. Neither the slip nor Frederick explained the reason for Jonjock's discharge.

Scott French began working for Zachry at the Jacksonville project in January. He did not engage in any union activities until he signed an authorization card on February 8. On March 2, French began displaying his union affiliation through stickers he placed on his lunchbox and hard hat, and in early April, French became a volunteer union organizer.

On April 15, French asked his Supervisor, Yarby Denham, if employees were going to start getting overtime. French testified that Denham told French and employee Russell Myers that they were on supervision's "hit list," ALJ Hr'g Tr. at 359, but that if they would stop displaying their

4

union affiliation, Denham would try to help them get overtime work. Denham denied the occurrence of this conversation.

French had approximately nine years of welding experience, and had passed both thin-wall and heavy-wall boiler tube welding tests. Foremen Anthony Mollica and Tony Boatman were in charge of a five-person crew assigned to do the first boiler tube welding on the construction project. French was a member of this crew. On April 17, the crew started welding in the afternoon and continued working until 7:30 or 8:30 p.m. According to French, after the crew finished welding, Mollica and Boatman inspected everyone's welds and stated that they were fine. Mollica testified that neither he nor Boatman inspected any of the welds that evening nor did they approve any welds.

Mollica testified that, on the morning of April 18, he discovered that five of French's welds were unacceptable, and on Monday, April 20, when the entire crew was back on the site, he met with Denham and told him about the problem welds. Denham inspected the welds with Mollica, and the two decided they had to be rewelded. Mollica and Denham spoke with French and instructed him to grind down the welds and to recap them. Denham stated that, if French did not get the welds right, Denham would demote him to structural welding at a dollar less per hour. Denham was not satisfied with the new welds and again told French to reweld, which French did. Denham and Mollica both testified that, in performing the third set of welds, French ground down into the boiler tube itself, which apparently is not a mistake an experienced welder would make. When Denham discovered that French had ground into the boiler tube, he discussed the situation with his supervisors and decided to discharge French. Denham discharged French and gave him a termination slip stating that he was not a qualified welder.

Russell Myers began working for Zachry at the Jacksonville project in December 1991 as a welder. Myers had eighteen years of welding experience and was not a member of the Union before he began working for Zachry. In early April, Myers became a member of the Union's volunteer organizing committee, and he began wearing a vest labeling himself as such. Myers worked under Denham's supervision and testified that Denham told him he would not be welding

5

on the boiler if he continued to wear the vest. Myers also testified that, on April 9, near the end of the work day, he was standing with three or four other employees when Denham joined the conversation. During the conversation, Denham commented that, if Myers did not stop wearing his vest, he would not be assigned to boiler welding and would not receive any overtime. Myers testified that in this conversation, Denham added that Myers's "days were numbered." ALJ Hr'g Tr. at 289. Denham denied the occurrence of both conversations. Myers continued to display his union affiliation.

On the morning of June 1, Myers took a mid-morning break as he often did. Myers testified that, while there were no scheduled breaks other than lunch, employees customarily took short morning and afternoon breaks. On this occasion, Myers opened his cooler and took out a sandwich. Reed approached Myers and told him he should eat breakfast before coming to work. Myers responded that he was waiting for his welding machine to cool off. Reed thought Myers's answer was sarcastic, and he told Myers that, if his welding machine burned up, Reed would buy Myers another one. Reed then told Myers to get back to work, which Myers did. Later that same day, Denham issued Myers a written reprimand for taking a break during work hours. It is undisputed that this was the first reprimand Myers had received on the job.

On June 15, Myers was welding part of a duct and, in order to complete the welding, had to go down one flight of stairs to weld an overhead part of the duct. To enable Myers to weld the duct, a crew was building a scaffold. Because the scaffold was not yet completed, Myers took his tools down to the welding location and then went to get welding rods. Myers testified that, after returning, he waited nearby for the scaffold's completion. Myers testified that, shortly after returning to work, Foreman Mickey Scobic wanted Myers to sign a reprimand for unwise use of time. Myers explained to Scobic that he could not begin work until the scaffold was finished, but Scobic replied that Myers had been out of his work area.[3]

---

[3]Scobic reported that Myers did not wait near the welding site for the scaffold's completion; rather, he left the area completely.

On June 22, Zachry furloughed approximately one hundred employees, including Myers. Myers and other employees were told to return to Zachry on July 2 to pick up their paychecks. When Myers returned, he learned that the furlough had been converted to an indefinite layoff. Myers testified that when he came back for his paycheck, Boilermaker Superintendent Wheat spoke with the employees and told them that Zachry was having financial problems, but that as soon as it received more funding for the job, Zachry would call employees back. Myers completed a new application and continued to check with Zachry's personnel office on a weekly basis.

In August, Zachry began recalling employees from the layoff, and Myers continued to check with the employment office. Each time, Myers was told that there were not any jobs available. At the time of the hearing before the ALJ, Zachry had hired approximately fifty welders at the Jacksonville jobsite since the furlough. Myers, however, was not rehired.

In 1988, Zachry adopted a policy, set forth in its Field Personnel Procedures Manual, regarding disqualification of applications. The Manual directs that any application containing nonresponsive information should be disqualified. An application is considered nonresponsive if it "reflects any information not requested on the Application Form."[4] Ex. RX-1 at III-16. Zachry's applications contain a statement that reads: "PROVIDE ONLY THE INFORMATION REQUESTED. FAILURE TO DO SO WILL RESULT IN DISQUALIFICATION OF YOUR APPLICATION." Ex. GC-2.

Beginning in late January and continuing throughout February, at least eighteen Union members applied for employment with Zachry. On their applications, the members identified themselves as "volunteer union organizers" by writing words to that effect at the bottom of the application. None of the individuals were hired. On March 25, Zachry sent letters to each of the individuals, notifying them that their applications had been disqualified because they were not completed in accordance with the instructions. The letter informed them that they were free to

_____

[4]The policy also states that "grossly and obviously incomplete" applications are to be disqualified. Ex. RX-1 at III-16.

re-apply. The parties stipulated that fourteen of the eighteen individuals were disqualified solely because they wrote "volunteer union organizer" or words to that effect on the application. Zachry contends that the applications of the other four individuals were disqualified because they did not contain all the information Zachry requested.

On November 27, 1992, the Union filed a Complaint alleging, *inter alia,* that Zachry violated sections 8(a)(1) and (3) of the Act by terminating Jonjock and French, by issuing disciplinary reprimands to Myers and refusing to recall Myers from layoff, and for maintaining and enforcing a policy under which applicants who wrote "volunteer union organizer" on their applications were disqualified. The ALJ determined that the evidence did not establish that Jonjock's union activity was a motivating factor in his discharge. However, the ALJ determined that Zachry violated sections 8(a)(1) and (3) of the Act when it discharged French because of his activities in support of the Union, when it reprimanded Myers and failed to recall him from layoff because of his support for the Union, and when it refused to consider applicants who wrote "volunteer union organizer" on their applications. The ALJ ordered Zachry to offer immediate employment to those who were disqualified for writing "volunteer union organizer" on their applications.

The Union and Zachry sought review before the Board. The Board adopted the ALJ's Order with several modifications. The Board determined that, in addition to violating the Act through the application of its nonresponsive information policy, Zachry violated section 8(a)(1) of the Act by adopting and maintaining the policy. The Board also determined that Zachry threatened Jonjock in violation of section 8(a)(1) when Frederick stated to Jonjock: "I terminated you yesterday.... Your organizing days is [sic] over, boy." ALJ Hr'g Tr. at 199. The Board nevertheless concluded that Zachry proved that Jonjock would have been terminated regardless of his union affiliation. Finally, the Board altered the ALJ's remedy by permitting Zachry to introduce evidence that the disqualified applicants would not have been hired in any event because those actually hired for the positions had superior qualifications.

On appeal, the Union petitions for review claiming that the Board erred when it concluded Zachry's treatment of Jonjock did not violate the Act. Zachry cross appeals challenging several of the Board's determinations. The Board requests that we enforce its Order in whole. For the reasons set forth in this opinion, we enforce the Order it part and deny enforcement in part.

II. DISCUSSION

When reviewing an order of the Board, "we are bound by the Board's factual findings if they are supported by substantial evidence on the record as a whole." *NLRB v. Malta Constr. Co.,* 806 F.2d 1009, 1010 (11th Cir.1986). If the Board has made a plausible inference from the record evidence, we may not overturn its findings, even if we would have made contrary findings upon a *de novo* review of the evidence. *See NLRB v. United Sanitation Service,* 737 F.2d 936, 938 (11th Cir.1984). "[C]redibility resolutions are peculiarly within the province of the ALJ and the Board and are entitled to deference unless inherently unreasonable or self-contradictory." *Id.* We note, however, that although our review is limited, that does not mean that "the Board is immune from judicial examination and reversal in proper cases.... Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown,* 380 U.S. 278, 290-91, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *accord NLRB v. Sherwin-Williams Co.,* 714 F.2d 1095, 1098 n. 3 (11th Cir.1983). We must set aside Board conclusions which "rest on erroneous legal foundations." *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). With these guidelines in mind, we review the Board's Order.

A. Jonjock's Termination

The Board upheld the ALJ's determination that Zachry did not violate section 8(a)(3) of the Act when it discharged Jonjock. The Board, however, modified the ALJ's decision by concluding that Frederick's statement to Jonjock ("I terminated you yesterday.... Your organizing days is [sic] over, boy.") constituted an independent violation of section 8(a)(1) of the Act because of the threatening nature of the statement. Nonetheless, the Board concluded that Zachry's termination was

not motivated by Jonjock's involvement in protected union activity but rather was motivated by Jonjock's poor work performance. The Union petitions for review claiming that the Board erroneously concluded that reasons other than Jonjock's union affiliation motivated Zachry's decision to discharge him.

Section 7 of the Act protects the rights of employees "to self-organiz[e], to form, join, or assist labor organizations, to bargain collectively ..., and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1994). Section 8(a)(1) of the Act provides that "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." *Id.* § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice "for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

In *Wright Line,* 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enf'd,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the Board established guidelines for determining whether an antiunion animus motivated an employer's action against an employee in violation of section 8(a)(1) or section 8(a)(3) of the Act. Under the *Wright Line* framework, the Union must "make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor' in the employer's decision." *Wright Line,* 251 N.L.R.B. at 1089. The burden then shifts to the employer to prove that "the same action would have taken place even in the absence of the protected conduct." *Id.* The Union may then offer evidence that "the employer's proffered "legitimate' explanation is pretextual—that the reason either did not exist or was not in fact relied upon—and thereby conclusively restore the inference of unlawful motivation." *United Sanitation Service,* 737 F.2d at 939. The Union contends that the Board incorrectly determined that Zachry satisfied its burden of proving that Jonjock's termination was motivated by his poor work performance.

10

After a careful review of the record, we conclude that substantial evidence supports the Board's determination that Jonjock would have been terminated even had he not engaged in protected union activity. The Board's conclusion rested largely on credibility determinations which were not "inherently unreasonable or self-contradictory." *United Sanitation Service,* 737 F.2d at 938. The evidence rather convincingly established that Zachry terminated Jonjock primarily because he improperly aligned two I-beams. The Union argues that Zachry's antiunion animus is evident because the welder who welded the beams into the incorrect alignment was not discharged. However, the evidence presented at the ALJ hearing established that in a three-person crew the fitter has primary responsibility for ensuring proper alignment of the material to be welded. Hence, because the fitter, i.e., Jonjock, improperly fitted the beams, he was discharged. The evidence did not establish that the welds were of poor quality; thus, the ALJ and the Board reasonably concluded that Zachry's failure to reprimand the welder did not establish that the company's actions toward Jonjock were motivated by an antiunion animus.

The Union also contends that the timing of Jonjock's termination established Zachry's illegal motivation. Jonjock worked from February 3 through February 27 without receiving any complaints as to the manner in which he was performing his job. Jonjock began openly displaying his union affiliation on February 27, just one day before the events which Zachry claims resulted in his discharge occurred. The Union argues that the timing of these events is not a matter of coincidence and establishes that Jonjock's union activity motivated Zachry's decision to discharge him. The timing of an employee's discharge may raise suspicions about a company's proffered motive. *See NLRB v. Brewton Fashions, Inc.,* 682 F.2d 918, 923 (11th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983). However, although Jonjock's union affiliation became apparent shortly before his termination, other events, including his poor performance and other strange behavior, similarly occurred near the time of his discharge. Jonjock's work performance and behavior tend to support the Board's conclusion that Jonjock's involvement in protected activity did not motivate Zachry's decision to fire him. In conclusion, we hold that the Board's determination

11

that Zachry did not violate the Act when it discharged Jonjock is supported by substantial evidence in the record. We therefore enforce the Board's Order as it applies to Mathew Jonjock's termination.

B. French's Termination

Zachry argues that the Board's determination that Zachry violated section 8(a)(3) of the Act when it terminated French is not supported by substantial evidence in the record. The Board adopted the ALJ's findings of fact and conclusions of law. *See H.B. Zachry,* 319 N.L.R.B. at 967. The ALJ credited French's testimony that Denham told him he was on supervision's "hit list" and that he would be able to get French overtime only if he would stop organizing. *See id.* 319 N.L.R.B. at 977. The ALJ also found that, shortly after Zachry assigned French to do boiler tube welding, Denham told French, if he did not correct his faulty welds, he would be demoted to structural welding at a dollar less per hour. *See id.* The ALJ determined that, while French did not perform satisfactory welds, Denham used French's poor performance as an excuse to fire French because of his union activity rather that demoting French to structural welding as Denham had earlier indicated he would do. *See id.* 319 N.L.R.B. at 978. The ALJ determined that Zachry had plenty of structural welding work available and that an antiunion animus motivated Denham's decision to terminate rather than demote French. *See id.*

Zachry takes issue with several of the ALJ's credibility determinations. Because these determinations are not "inherently unreasonable or self-contradictory," *United Sanitation Service,* 737 F.2d at 938, we will not question them on appeal. Zachry also argues that the record establishes that the company was not hiring structural welders at the time of French's termination; therefore, placing French in a structural welding position would have resulted in excess manpower. We conclude that Zachry's argument is without merit. The record establishes that, until April 17, when the first boiler tube welding occurred at the construction site, French had been performing other types of welding work for Zachry. French then performed boiler tube welding for two days before he was terminated. We find that substantial evidence in the record supports the ALJ's conclusion that Denham could have easily moved French back to the type of work he was doing immediately

12

before he was assigned to do the boiler tube welds. We therefore enforce the Board's determination that Zachry's actions toward French violated the Act.

## C. Myers's Reprimand

Zachry also contends that the Board's determination that Zachry reprimanded Myers because of his union affiliation is not supported by substantial evidence.[5] The Board adopted the ALJ's determination that Myers received two reprimands as a result of his protected union activity. Zachry argues that the first incident, when Reed reprimanded Myers for eating a sandwich during a mid-morning break, was motivated by Reed's anger rather than by antiunion animus. The ALJ noted that mid-morning and afternoon breaks were common among Zachry employees. The only difference between Myers's break and those taken by other employees was that during his break, Myers wore items which displayed his union affiliation, while other employees did not. The ALJ concluded that, because Zachry did not attempt to counter the evidence that employees commonly took short breaks during the workday, the evidence easily allowed the inference that Reed's actions toward Myers were taken in response to Myers's union affiliation. We find that the ALJ's conclusion is well-reasoned and is supported by substantial evidence in the record.

The ALJ also determined that Myers received a second reprimand from Foreman Scobic two weeks after he received his first reprimand and that Scobic's reprimand was motivated by Myers's protected union activity. Zachry contends that the Scobic "was an aggressive supervisor who disciplined many subordinates[, and h]is decision to discipline Myers arose from that management philosophy." Zachry Br. at 50. We disagree with Zachry's contention and conclude that substantial evidence supports the ALJ's determination. The evidence established that Myers could not continue his work until the crew finished building a scaffold because he could not reach the work area until the structure was completed. Furthermore, the ALJ correctly noted that Myers attempted to use the waiting period in an efficient manner by going to retrieve tools he would need to complete the job.

_____

[5]Zachry does not challenge the Board's determination that Zachry failed to recall Myers from layoff because of an antiunion animus; therefore, we summarily affirm the Board's decision on that issue. *See United Sanitation Service,* 737 F.2d at 938 n. 1.

13

As noted by the ALJ, other background evidence convincingly establishes a prevalent antiunion animus toward Myers. Denham told Myers that, if he continued to wear union insignia, Myers would not be welding on the boiler. In a later conversation, Denham told Myers that, if he would stop displaying his union affiliation, Denham would get him overtime assignments. Denham also told Myers that if he continued to wear his union insignia, Myers's "days were numbered." ALJ Hr'g Tr. at 289. Finally, Denham told French and Myers that they were on supervision's "hit list," ALJ Hr'g Tr. at 359, because of their display of union support. We conclude that substantial evidence supports the ALJ's conclusion that Zachry reprimanded Myers because of his union affiliation.

D. Zachry's Nonresponsive Information Policy

The parties have spent considerable time in their briefs and at oral argument discussing whether Zachry's nonresponsive information policy violates sections 8(a)(1) and (3) of the Act. The ALJ determined that Zachry violated the Act when it applied the policy to those who wrote "volunteer union organizer" on their applications because the policy was inherently destructive of rights protected under section 7 of the Act, specifically the rights of union members to self-identify and to attempt to organize fellow employees. *See H.B. Zachry,* 319 N.L.R.B. at 979-80. The ALJ further concluded that, even if the application of the policy was not inherently destructive of section 7 rights, the comparatively slight effect the policy had on those rights violated the Act because Zachry was unable to come forward with a substantial business justification for the policy. *See id.* 319 N.L.R.B. at 981. The Board agreed with the ALJ's conclusion but further determined that Zachry's adoption and maintenance of the policy constituted a "per se" violation of section 8(a)(1) of the Act because the policy was "unlawful on its face regardless of its application." *See id.* 319 N.L.R.B. at 968. Zachry argues on appeal that the policy does not violate section 8(a)(1) of the Act because it does not infringe upon rights protected under section 7.

Section 8(a)(1) of the Act establishes that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]."

14

29 U.S.C. § 158(a)(1). Therefore, in order to determine whether Zachry violated section 8(a)(1), we must first determine whether the policy interferes with rights protected under section 7. Section 7 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. Zachry's nonresponsive information policy prohibited job applicants from supplying information which was not specifically requested in the application. The applications contained a warning that failure to comply with the directive would result in disqualification of the application. Therefore, we consider whether Zachry's nonresponsive information policy, on its face or in its application, interferes with a right or rights protected by section 7.

The ALJ reasoned that an employee's act of writing "volunteer union organizer" on his employment application is analogous to an employee's protected right to display union insignia. *See H.B. Zachry,* 319 N.L.R.B. at 980. While we recognize that the right to wear union insignia has long been considered a protected right under the Act, *see Republic Aviation Corp. v. N.L.R.B.,* 324 U.S. 793, 803, 65 S.Ct. 982, 987-88, 89 L.Ed. 1372 (1945); *Malta Constr. Co.,* 806 F.2d at 1011, we do not agree with the ALJ's conclusion that the activity involved in this case is sufficiently analogous to the display of union insignia to enjoy similar section 7 protection. The right to wear union insignia in the work place "furthers "the right effectively to communicate with *one another* regarding self-organization at the jobsite.' " *Virginia Elec. and Power Co. v. N.L.R.B.,* 703 F.2d 79, 82 (4th Cir.1983) (emphasis in original) (quoting *Beth Israel Hospital v. N.L.R.B.,* 437 U.S. 483, 491, 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370 (1978)). Therefore, the right to wear union insignia in the workplace, which is not specifically mentioned in section 7, stems from the right to "self organiz[e]." 29 U.S.C. § 157. Without the right to display one's union affiliation in the workplace, the realization of solidarity necessary to effective self-organization would not exist. In the present case, union members did not attempt to communicate their union affiliation to other employees; they attempted to communicate that affiliation only to the employer. Thus, the interests of solidarity and

15

self-organization are not at stake in this case. Any display of union affiliation in a job application, which is seen only by the employer, is not linked to a purpose protected by the Act. *Cf. Pay'n Save Corp. v. N.L.R.B.,* 641 F.2d 697, 700 (9th Cir.1981) ("[A]n employee['s right] ... to wear union buttons and insignia at work ... is not per se guaranteed by the Act;  evidence of a purpose protected by the act is also required." (internal quotations omitted)).

The Union members in this case admittedly wrote "volunteer union organizer" on their applications because, once having done so, they could conclusively establish that the employer was aware of their union affiliation.[6]  Zachry, in part to combat this litigation tactic,[7] developed the nonresponsive information policy.  Zachry's theory in enacting the policy was that, if applicants were not permitted to provide nonresponsive information such as race, disability, or union affiliation, then Zachry could not use those factors against an applicant in the hiring process. Therefore, Zachry instituted a neutral nondiscriminatory policy which was designed to permit management to consider only those factors which were actually relevant to an applicant's suitability to a particular job.  The right then which the Union and the Board ask us to recognize, is the right for Union applicants to let potential employers know about their union affiliation in direct contravention of the employer's neutral nondiscriminatory policy prohibiting extraneous information of any kind.  We are not aware of a single court which has recognized such a right.

Zachry's applications request and require only information which is pertinent to evaluating job applicants.  To be sure, there are several questions which provide a union job applicant the opportunity to inform management of his union affiliation.  For example, when reporting relevant work history, an applicant could include work for prior union contractors thus indicating potential

---

[6]In order to establish a violation of section 8(a)(3) under the Act, the charging party must prove that the employer had knowledge of the employees' union activities.  *See N.L.R.B v. Computed Time Corp.,* 587 F.2d 790, 795 (5th Cir.1979).

[7]The ALJ found that Zachry's sole purpose in developing the nonresponsive information policy was to "construct a defense in litigation."  *H.B. Zachry,* 319 N.L.R.B. at 981.  However, the record contains substantial evidence that Zachry had other reasons for instituting the policy, such as receiving cleaner, easier-to-read applications and preventing discrimination.

16

union affiliation. Similarly, when reporting relevant training courses, an applicant could report participation in union-sponsored training programs. In fact, several of the eighteen applicants who were disqualified for writing "volunteer organizer" on their applications had filed earlier applications with Zachry which denoted union affiliation through one of the specific application questions. The earlier applications were not disqualified because the information was in response to specific questions; thus, the information was responsive rather than nonresponsive. In cases where this type of information is appropriately reported, the applicant will be able to establish that Zachry had knowledge of his union affiliation. However, an applicant who is unable to show his union affiliation through the requested information does not have a section 7 right to inform Zachry of his union affiliation in direct contravention of Zachry's neutral policy prohibiting nonresponsive information. If such an applicant believes he has been discriminated against because of his union involvement, the applicant must prove Zachry's knowledge of the union affiliation in another manner. Moreover, we have serious doubts regarding Zachry's ability to discriminate based on union affiliation when such affiliation, along with all other types of nonresponsive information, cannot be reported in the application.

Furthermore, the record establishes that Zachry did not violate section 8(a)(3) of the Act because it applied the nonresponsive information policy in a nondiscriminatory manner. As of June 1992, Zachry had disqualified approximately 200 applications for containing nonresponsive information. Examples of nonresponsive information which resulted in disqualification include: "Passed all pipe tests in December '91 for Zachry;" ALJ Hr'g Tr. at 502, "I've been welding for [twenty] years;" *id.,* "Dropped union card in '89;" *id.* at 501, "See Steve of survey crew;" *id.* at 502, and "General contractor owed me $400 and never paid me so I found out where he lived and collected;" *id.* at 508. Thus, the evidence establishes that Zachry did not only disqualify applications which contained union-related nonresponsive information but also disqualified applications containing other types of nonresponsive information. Furthermore, once Zachry determined that an application contained nonresponsive information, management sent a letter to the applicant

17

informing him of his disqualification and inviting him to reapply. The union members who wrote "volunteer union organizer" on their applications received the same courtesy.[8] Therefore, we determine that the evidence does not establish that Zachry discriminated against those who wrote "volunteer union organizer" on their applications. *Cf. TIC-The Industrial Co. Southeast, Inc. v. N.L.R.B.,* (D.C.Cir.1997) (holding that employer did not violate the Act when it refused to consider for hire union members who failed to comply with employer's neutral application procedures). We therefore reject the ALJ's determination that Zachry's application of its nonresponsive information policy violated sections 8(a)(1) and (3) of the Act. We similarly reject the Board's decision that the existence of Zachry's policy constituted a per se violation of section 8(a)(1) of the Act.

In conclusion, we hold that Zachry's nonresponsive information policy does not infringe upon rights guaranteed by section 7 and therefore does not violate section 8(a)(1) of the Act. We further hold that Zachry did not discriminatorily enforce the policy. We therefore deny enforcement of that portion of the Board's Order which holds otherwise.

### III. CONCLUSION

For the reasons set forth in this opinion, we ENFORCE the Board's Order in part and DENY enforcement in part.

---

[8] We note that this case significantly differs from other cases which have decided similar issues. For example, in one case in which the Board determined that the employer discriminated against those who wrote "volunteer union organizer" on their applications, the employer did not have a nonresponsive information policy in place. *See Fluor Daniel, Inc.,* 304 N.L.R.B. 970 (1991). In other cases, employers discriminatorily applied various application rules. *See e.g., Fluor Daniel, Inc.,* 311 N.L.R.B. 498, 499 (1993) (finding that employer discriminatorily applied policy against accepting applications submitted in bulk), *enf'd in relevant part, N.L.R.B. v. Fluor Daniel, Inc.,* 102 F.3d 818, 829 (6th Cir.1996) (noting that the only argument raised on appeal—that applicants who wrote "volunteer union organizer" on applications were not bona fide employees under the Act—was specifically rejected by the Supreme Court in *N.L.R.B. v. Town & Country Elec., Inc.,* 516 U.S. 85, ----, 116 S.Ct. 450, 457, 133 L.Ed.2d 371 (1995)).